LUMBARD, Circuit Judge:
 

 Joseph C. and Ellen A. Taddeo live at 6 Ort Court, Sayville, New York. Three years ago they defaulted on their mortgage to Elfriede Di Pierro. Di Pierro accelerated the mortgage, declared its balance due immediately, and initiated foreclosure proceedings. The Taddeos sought refuge under Chapter 13 of the new Bankruptcy Code, staying the foreclosure action under the automatic stay, 11 U.S.C. § 365(a) (Supp. IV 1980), and proposing to cure the default and reinstate the mortgage under 11 U.S.C. § 1322(b)(5). Di Pierro is listed as the Taddeos’ only creditor. She rejected the plan to cure the default, and applied for relief from the automatic stay in order to foreclose. Di Pierro contended that once she accelerated her mortgage, the Taddeos had no way to cure the default under the Bankruptcy Code except to pay the full amount as required by state law. Bankruptcy Judge Párente held that the Taddeos could cure the default and reinstate their mortgage, and denied Di Pierro’s motion for relief from the stay.
 
 In re Taddeo,
 
 9 B.R. 299 (Bkrtcy.E.D.N.Y.1981). Judge Pratt affirmed, 15 B.R. 273 (Bkrtcy.E.D.N.Y.1981). We affirm. We do not believe that Congress labored for five years over this controversial question only to remit consumer debtors — intended to be primary beneficiaries of the new Code — to the harsher mercies of state law.
 

 Di Pierro originally owned the house at 6 Ort Court. On June 14, 1979, she sold the house to the Taddeos, taking in return a “purchase money second mortgage” to secure a principal balance of $13,000. The property is subject to a first lien held by West Side Federal Savings & Loan Association, which is not involved in this case.
 
 [1]
 
 Di Pierro’s second mortgage was payable over 15 years at 8.5 percent in equal monthly installments of $128.05.
 

 Upon taking occupancy, the Taddeos notified Di Pierro that they had discovered defects in the property.
 
 [2]
 
 On advice of counsel, the Taddeos said they would withhold mortgage payments, depositing the money instead with their attorney. The Taddeos and Di Pierro corresponded for several months without reaching an agreement. On October 5, 1979, Di Pierro wrote that she was accelerating the mortgage and declaring the entire balance due immediately. The mortgage contained the acceleration clause specifically approved in N.Y. Real Prop. § 258 Schedule M (McKinney 1968), which gives the mortgagee the option to accelerate after a default in mortgage payments.
 

 Di Pierro commenced foreclosure proceedings in state court on October 19, 1979. The Taddeos tendered full payment of their arrears by check on October 31,1979, but Di Pierro refused to accept payment. The state court granted summary judgment to Di Pierro and ordered a referee to determine the amount owed. After a hearing on June 30, 1980, the referee found the Tadd-eos liable for $14,153.48 in principal and interest, plus interest subsequent to the award.
 

 Before Di Pierro could obtain final judgment of foreclosure and sale, the Taddeos filed a Chapter 13 bankruptcy petition in the Eastern District on July 10, 1980. The court appointed Harold F. Cullen as interim trustee and Richard McCord as successor trustee. 11 U.S.C. § 1302. The petition listed Di Pierro as the only creditor, and stayed Di Pierro’s foreclosure action. The Taddeos filed a plan proposing to pay off arrears on the mortgage in installments of $100 per month. The plan further proposed to restore the mortgage and its original
 
 *26
 
 payment schedule, with payments through McCord as trustee to Di Pierro during the 3-year life of the plan and directly to Di Pierro after the plan ended. Di Pierro objected to the plan,
 
 [3]
 
 and petitioned for relief from the automatic stay so that she could proceed with her foreclosure action. Di Pierro contended that her rights as mortgagee could not be affected by the Chapter 13 plan. Bankruptcy Judge Párente, however, held that the Taddeos could pay their ar-rearages and reinstate their mortgage under this section notwithstanding Di Pierro’s acceleration, analogizing § 1322(b) to 11 U.S.C. § 1124(2), which nullifies acceleration clauses in Chapter 11 corporate reorganizations. Therefore Bankruptcy Judge Párente denied Di Pierro relief from the automatic stay. District Judge Pratt affirmed on similar reasoning.
 

 Because Di Pierro is the Taddeos’ only creditor, continuance of the stay is justified only if the Taddeos’ plan can in fact provide for Di Pierro’s mortgage. Otherwise, the stay would serve only to delay foreclosure for delay’s sake, and would not be justified.
 
 In re Pearson,
 
 4 Collier Bankr.Cas.2d (MB) 57, 64 n. 8, 10 B.R. 189 (Bkrtcy.E.D.N.Y. 1981). Therefore, although the Taddeos’ Chapter 13 plan is not before us for approval, the question of whether under the plan the Taddeos can pay arrearages to Di Pierro and thereby cure the default and reinstate the mortgage is squarely presented for decision.
 
 [4]
 

 The relevant parts of § 1322(b) read as follows:
 

 (b) ... the plan may—
 

 ******
 

 (2) modify the rights of holders of secured claims other than a claim secured only by a security interest in real property that is the debtor’s principal residence, or of holders of unsecured claims;
 

 (3) provide for the curing or waiving of any default;
 

 ******
 

 (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;
 

 When Congress empowered Chapter 13 debtors to “cure defaults,” we think Congress intended to allow mortgagors to “deaccelerate” their mortgage and reinstate its original payment schedule. We so hold for two reasons. First, we think that the power to cure must comprehend the power to “de-accelerate.” This follows from the concept of “curing a default.” A default is an event in the debtor-creditor relationship which triggers certain consequences—here, acceleration. Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of “cure” used throughout the Bankruptcy Code. Under § 365(b), the trustee may assume executory contracts and unexpired leases only if he cures defaults—but the cure need address only the individual event of default, thereby repealing the contractual consequences. Fogel,
 
 Executory Contracts and Unexpired Leases in the Bankruptcy Code,
 
 64 Minn.L.Rev.
 
 *27
 
 341, 356 (1980).
 
 See Collier on Bankruptcy
 
 § 365.04 at 365-31-32 (L. King 15th Ed. 1981).
 
 [5]
 

 See also
 
 11 U.S.C. § 1110(a)(2); 124 Cong.Rec. H 11,102 (Sept. 28, 1978); S 17,-419 (Oct. 6, 1978) (trustee may continue in possession of aircraft and ships by curing defaults and making payments in original lease or contract); 11 U.S.C. § 1168(a)(2), H.R.Rept. 595, 95th Cong. 1st Sess. 423 (1977) (trustee may retain rolling stock if he cures default and agrees to make original payments). Such legislative history as there is supports a similar reading of § 1322(b)(5). Both the Bankruptcy Commission’s Bill, see § 6-201(2) & (4) and accompanying commentary, and the Bankruptcy Judges’ Bill, § 6-301(2), plainly permitted the cure and de-acceleration of residential debt accelerated prior to petition. Although H.R. 6, 95th Cong. 1st Sess. § 1322(b) (1977), which superseded these bills, omitted a proviso contained in § 6-301(2) of the Judges’ Bill that made this entirely clear, it is evident that this was done because the clause was regarded as surplusage. H.R. 6 adopted language almost identical to § 6-301(2) of the Commission’s Bill, which accomplished just what the Judges’ Bill did, albeit in different language. In fact, H.R. 6 went beyond either of its predecessors and permitted the
 
 modification
 
 of debt secured by a debtor’s residence. Although the Senate later adopted a prohibition against modification of the rights of holders of secured real estate debt, S. 2266, 95th Cong. 2nd Sess. § 1322(b)(2), which the House accepted insofar as it related to debt secured by a debtor’s principal residence, 124 Cong.Rec. H 11106 (September 28, 1978), the cure and maintain powers of paragraph (b)(5) remained unchanged. This history and the policy discussed above compel the conclusion that § 1322(b)(5) was intended to permit the cure and de-acceler-ation of secured long-term residential debt accelerated prior to the filing of á Chapter 13 petition.
 

 Policy considerations strongly support this reading of the statute. Conditioning a debtor’s right to cure on its having filed a Chapter 13 petition prior to acceleration would prompt unseemly and wasteful races to the courthouse. Worse, these would be races in which mortgagees possess an unwarranted and likely insurmountable advantage: wage earners seldom will possess the sophistication in bankruptcy matters that financial institutions do, and often will not have retained counsel in time for counsel to do much good. In contrast, permitting debtors in the Taddeos’ position to de-accelerate by payment of the arrearages will encourage parties to negotiate in good faith rather than having to fear that the mortgagee will tip the balance irrevocably by accelerating or that the debtor may prevent or at least long postpone this by filing a Chapter 13 petition.
 

 Secondly, we believe that the power to “cure any default” granted in § 1322(b)(3) and (b)(5) is not limited by the ban against “modifying” home mortgages in § 1322(b)(2) because we do not read “curing defaults” under (b)(3) or “curing defaults and maintaining payments” under (b)(5) to be
 
 modifications
 
 of claims.
 

 It is true that § 1322(b)(5)’s preface, “notwithstanding paragraph (2),” seems to treat the power to cure in (b)(5) as a subset of the power to modify set forth in (b)(2), but that superficial reading of the statute must fall in the light of legislative history and legislative purpose. The “notwithstanding” clause was added to § 1322(b)(5) to emphasize that defaults in mortgages could be cured notwithstanding § 1322(b)(2).
 
 See
 
 124 Cong.Rec. H 11,106 (Sept. 28, 1978); S.17,423 (Oct. 6, 1978). But the clause was not necessary. The Senate protected home mortgages from
 
 modification
 
 in its last bill, S. 2266, 95th Cong., 2d Sess.; it evinced no intent to protect these mortgages from
 
 cure. Cf. Hearings on S. 2266 Before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary,
 
 95th Cong., 1st Sess. 836 (1977) (Statement of Charles A. Horsky, Chairman, National
 
 *28
 
 Bankruptcy Conference (S. 2266 “is completely unclear as to whether the plan can provide for the curing of defaults and the making of current payments.”) Indeed, earlier Senate bills along with House bills and the present statute listed the power to cure and the power to modify in different paragraphs, indicating that the power to cure is different from the power to modify. Testimony submitted on behalf of secured creditors distinguished between modifying a claim (by reducing payments due thereon) and curing a default (and maintaining those payments).
 
 See Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,
 
 94th Cong., 1st Sess. 1027 (Statement of Walter W. Vaughan on behalf of the American Bankers Association)
 
 Hearings Before the Subcommittee on Improvements in the Judicial Machinery of the Senate Committee on the Judiciary,
 
 94th Cong., 1st Sess. 130
 
 (idem).
 
 Finally, the few cases under Chapter XIII of the old Bankruptcy Act distinguished between modifying a claim and maintaining payments thereon,
 
 see Hallenbeck v. Penn Mutual Life Insurance Co.,
 
 323 F.2d 566 (4th Cir. 1963);
 
 In re O’Dell,
 
 198 F.Supp. 389, 391 (D.Kan.1961), and indicate that curing a default and maintaining payments on a claim did not modify that claim.
 
 See In re Delaney,
 
 534 F.2d 645, 646-47 (5th Cir. 1976) (per curiam);
 
 In re Howard,
 
 344 F.Supp. 1138 (E.D.Ark.1971).
 

 Our reading of the statute disposes of Di Pierro’s major contentions on appeal. Di Pierro argues that the Taddeos cannot use § 1322(b)(5) to cure their default and maintain payments on her mortgage because (b)(5) applies only to claims whose last payment is due after the last payment under the plan is due. Di Pierro maintains her acceleration of the mortgage makes all payments due
 
 now. See In re Williams,
 
 11 B.R. 504 (Bkrtcy.S.D.Texas 1981);
 
 In re Paglia,
 
 8 B.R. 937 (Bkrtcy.E.D.N.Y.1981). But we hold that the concept of “cure” in § 1322(b)(5) contains the power to de-accel-erate. Therefore the application of that section de-accelerates the mortgage and returns it to its 15-year maturity. Alternatively, we hold that the ban on “modification” in § 1322(b)(2) does not limit the Taddeos’ exercise of their curative powers under either § 1322(b)(3) or (b)(5). Therefore the Taddeos may first cure their default under (b)(3) and then maintain payments under (b)(5).
 
 See In re Soderlund,
 
 7 B.R. 44 (Bkrtcy.S.D.Ohio 1980),
 
 rev’d,
 
 18 B.R. 12 (S.D.Ohio 1981).
 

 Di Pierro also argues that under New York law the Taddeos cannot “cure” an accelerated mortgage without paying the full amount of the claim, and further asserts that the Bankruptcy Code does not empower the Taddeos to override New York law. She asserts that Congress explicitly gave corporate debtors the power to cure defaults without regard to acceleration by passing 11 U.S.C. § 1124(2), and concludes that the absence of similar language in § 1322(b) indicates that Chapter 13 debtors cannot cure defaults unless they also cure acceleration.
 
 See In re Williams,
 
 11 B.R. 504 (Bkrtcy.S.D.Tex.1981);
 
 In re Paglia,
 
 8 B.R. 937 (Bkrtcy.E.D.N.Y.1981). The bankruptcy court took the opposite tack, reasoning that Congress, having provided corporate debtors with curative powers under § 1124(2), must have intended similar powers to be exercised by consumer debtors under § 1322(b) as consumers are more favored by Chapter 13 than corporate debtors are by Chapter 11.
 

 Both rationales mistake the import of § 1124. That section determines who has the right to vote on a Chapter 11 plan. Those parties with “impaired” claims or interest can vote, and § 1124(1) declares that
 
 any
 
 change in legal, equitable or contractual rights creates impairment. Having defined impairment in the broadest possible terms, Congress carved out a small exception to impairment in § 1124(2) providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby “impair” a creditor’s claim. “The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain.” S.Rep.No.989,
 
 *29
 
 95th Cong., 2d Sess. 120 (1978). Section 1124(2) merely takes away the creditor’s right to vote in the event of cure; the authority to cure is found in § 1123(a)(5)(G) in plain language similar to § 1322(b).
 
 See In re Thompson,
 
 17 B.R. 748, 753 (Bkrtcy. W.D.Mich.1982). In short, “curing a default” in Chapter 11 means the same thing as it does in Chapters 7 or 13: the event of default is remedied and the consequences are nullified. A state law to the contrary must fall before the Bankruptcy Code.
 

 Di Pierro argues further that § 1322(b)(5) requires the Taddeos to cure their default “within a reasonable time,” and that under New York law that time has passed. But clearly the “reasonable time” requirement refers to time after a Chapter 13 petition is filed. Otherwise Chapter 13 debtors would forfeit their right to cure merely by negotiating with their creditors, or, as in this case, litigating the right of their creditor to declare a default. The bankruptcy courts which have allowed Chapter 13 debtors to cure defaults under § 1322(b)(5) have assumed that “reasonable time” refers to time after the petition was filed.
 
 See In re Acevedo,
 
 4 Collier Bankr. Cas.2d (MB) 178, 9 B.R. 852 (Bkrtcy.E.D.N. Y.1981);
 
 In re King,
 
 3 Collier Bankr.Cas.2d (MB) 109, 7 B.R. 110 (Bkrtcy.S.D.Cal.1980). We find no support for Di Pierro’s contention that state law must govern what constitutes a reasonable time.
 
 [6]
 

 Di Pierro’s argument reduces in the end to an assertion that because she can accelerate her mortgage under state law, the Taddeos can cure only as provided by state law. This interpretation of § 1322(b) would leave the debtor with fewer rights under the new Bankruptcy Code than under the old Bankruptcy Act of 1898.
 
 [7]
 
 Defaulting mortgagees would forfeit their right to cure even before the start of foreclosure proceedings, before they have hired lawyers and therefore before they knew anything about their rights under Chapter 13. Such a result would render the remedy in § 1322(b) unavailable to all but a select number of debtors.
 
 See In re Thompson,
 
 17 B.R. 748, 752-53 (Bkrtcy.W.D.Mich.1982). Such a result would be totally at odds with the “overriding rehabilitative purpose of Chapter 13.”
 
 In re Davis,
 
 15 B.R. 22, 24 (Bkrtcy.D.Kan.),
 
 aff’d,
 
 16 B.R. 473 (D.Kan. 1981).
 

 Affirmed.
 

 [1]
 

 . The record does not indicate the status of the first lien in the Chapter 13 proceeding.
 

 [2]
 

 . The nature of the alleged defects does not appear in the record.
 

 [3]
 

 . The Taddeos’ plan could be confirmed over Di Pierro’s protest. 11 U.S.C. § 1325(a)(5)(B).
 

 [4]
 

 . Bankruptcy Judge Parente’s denial of relief from the automatic stay was the equivalent of a permanent injunction.
 
 See
 
 H.R.Rep.No.595, 95th Cong. 1st Sess. 344 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. It was a final order disposing of Di Pierro’s petition for relief from the automatic stay, and was therefore appealable as of right to the district court, 28 U.S.C. § 1334(c), and to this court, 28 U.S.C. § 1291. One treatise states that all appeals from proceedings involving the automatic stay are interlocutory and appealable only by leave of the district and appellate courts. 1 Collier on Bankruptcy ¶ 3.03[7](e) (1981). But Collier’s conclusion is based on the premise that “by definition” all orders granting an injunction are interlocutory in nature. Id. at 3-311. We cannot agree. An order granting a
 
 permanent
 
 injunction is a final order.
 
 See Vicksburg v. Henson,
 
 231 U.S. 259, 266-67, 34 S.Ct. 95, 97-98, 58 L.Ed. 209 (1913). Congress manifestly intended to treat final denial of relief from the automatic stay as a final order.
 

 [5]
 

 . The debtor is liable for any damage sustained by the creditor in relying upon acceleration, but is not liable for the acceleration itself. 11 U.S.C. § 365(b)(1)(B).
 

 [6]
 

 . Events prior to bankruptcy, of course, may influence what constitutes a “reasonable time” to cure defaults after the petition is filed.
 

 [7]
 

 . Under the old Bankruptcy Act, a bankruptcy court could enjoin a mortgagee from foreclosure so long as the injunction did not impair the value of the mortgagee’s security and the mortgagee received no less than the payments provided for in the mortgage.
 
 Hallenbeck v. Penn Mutual Life Insurance Co.,
 
 323 F.2d 566 (4th Cir. 1963);
 
 In re Freed & Co.,
 
 534 F.2d 1235, 1239 (6th Cir. 1976).