* Editor's Note: The Supplemental Order of Jan. 31, 1984 was entered after Notice of Appeal

**In re E.Z. CARR, Debtor.**

**Bankruptcy No. 83–01630A.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Jan. 19, 1984.

Supplemental Order Jan. 31, 1984.*

Thomas E. Prior, McCalla, Raymer, Padrick, Cobb & Nichols, Atlanta, Ga., for First Family Mortg. Corp.

Paul C. Parker, Decatur, Ga., for debtor.

## ORDER

W. HOMER DRAKE, Bankruptcy Judge.

This case is before the Court on the Motion to Amend Judgment filed by the First Family Mortgage Company ("FFMC"). On August 18, 1983, the Court entered an Order sustaining the debtor's objection to the proof of claim filed by FFMC, 32 B.R. 343. FFMC filed its timely motion to amend on August 24, 1983. The question before the

from Order of January 19, 1984 was filed.

Court is whether it should reconsider the holding of the August 18, 1983 Order denying FFMC's claim for interest on mortgage arrearages secured by the debtor's principal residence, which debt was cured and reinstated under the debtor's Chapter 13 plan of reorganization.

The August 18, 1983 Order stated the issue in the following terms:

> The issue presented is whether or not a secured creditor who holds a security interest in the debtor's principal residence is entitled to receive interest on arrearages where the debtor is seeking to cure a default and reinstate a mortgage.

FFMC characterizes the issue as whether, under 11 U.S.C. § 1325(a)(5)(B)(ii), a holder of an allowed secured claim consisting of arrearage on the debtor's residential mortgage is entitled to receive payments under the plan with a value, as of the effective date of the plan, not less than the allowed amount of the claim. In other words, FFMC contends that the issue involves its right to receive payments equal to the present value of its claim. The Court acknowledges FFMC's phraseology, but, for the following reasons, sustains its prior decision to deny FFMC's claim.

The Court's Order gave substantial weight to the opinion of Judge Kelley in *In re Simpkins,* 16 B.R. 956 (Bkrtcy.E.D.Tenn. 1982). In *Simpkins,* the situation before Judge Kelley was a cure and reinstatement of several debts secured by a second mortgage on real property which was the debtor's principal residence. One of the debts which was cured and reinstated, the second mortgage note, provided that a late charge of $5.00 would be imposed on each payment in default and that interest would accrue at 6%. Judge Kelley held that, as to the four monthly payments in arrears on that note, the second mortgagee would be entitled to add the $20.00 in late charges to the arrearages and receive 6% interest on the total.

The Order of this Court states that FFMC is entitled to reasonable late charges and interest provided for in the contract. The allowable portion of FFMC's claim is as follows: $2,972.20 (10 × $297.22) for the ten months arrearages; $107.01 for accrued late charges; $400.00 for attorney's fees; and $100.00 for foreclosure advertising costs. FFMC's contract did not specify that interest shall accrue, so the Court disallowed interest on FFMC's $3,579.21 claim.

This Court endorses the rationale of *Simpkins.* Judge Kelley's analysis will be briefly reiterated below and supplemented by this Court's own analysis. Before engaging in that explanation, however, the Court must note one caveat.

The concept of cure and reinstatement under the Bankruptcy Code has stimulated much litigation, and the Courts have come to opposite conclusions.[1] At the crux of both this Court's Order and Judge Kelley's opinion in *Simpkins* is an interpretation of cure and reinstatement under the Bankruptcy Code which comports with the opinion of the United States Court of Appeals for the Second Circuit in *In re Taddeo,* 685 F.2d 24 (2d Cir.1982). The Court in *Taddeo* characterizes cure and reinstatement of a mortgage under Chapter 13 of the Bankruptcy Code as follows:

> A default is an event of the debtor-creditor relationship which triggers certain consequences—here, acceleration. Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code ... [T]he cure need address only the individual event of default, thereby repealing the contractual consequences. [Cites omitted.]

This Court explicitly accepted *Taddeo* in the case of *The Midland Mutual Life Insurance Company v. Masnorth Corp. (In re Masnorth Corp.),* 28 B.R. 892 (Bkrtcy.N.D.Ga.

---

1. See Sable, "A Chapter 13 Debtor's Right to Cure Default Under Section 1322(b): A Problem of Interpretation", 57 Am.Bankr.L.J. 127 (1982); Comment, "Home Foreclosures Under Chapter 13 of the Bankruptcy Reform Act", 30 U.C.L.A.L.Rev. 637 (1983). See also footnote 6.

1983), as did Judge Kelley in *Simpkins.* The Court's prior opinion in the instant case implicitly assumed the correctness of *Taddeo.*

A number of the cases cited by FFMC interpret cure and reinstatement in a manner contrary to *Taddeo.* Hence, the language in those cases is inapposite a *Taddeo* -like cure and reinstatement wherein the mortgage contract is deemed to remain in place but for deacceleration of the debt.

A significant development regarding the diverse interpretation of cure and reinstatement is the recent decision by the United States Court of Appeals for the Fifth Circuit in *Grubbs v. Houston First American Savings Association,* 718 F.2d 694 (5th Cir. 1983).[2] The Fifth Circuit held in *Grubbs* that acceleration of the outstanding principal and accrued interest upon the debtor's pre-petition default precluded cure and reinstatement under the Chapter 13 plan. The decision of the Fifth Circuit lends credence to the cases cited by FFMC. Nevertheless, this Court will continue to adhere to *Taddeo* and its progeny unless binding authority to the contrary is established within this circuit.

Judge Kelley's rationale for holding that interest on arrearages is governed by the contract is summarized as follows:

> [T]hough § 1322(b)(2) deals with the "rights of the holder of a claim," the emphasis should be on "claim." A claim is a right to payment. 11 U.S.C. § 101(4)(A). The special protection of § 1322(b)(2) prevents application of the "cram-down" provision, § 1325(a)(5)(B) ... Section 1325(a)(5)(B) allows a plan to be confirmed if it provides for payment of the amount of the secured claim plus an allowance for the time-value of money while the claim is being paid. 11 U.S.C. § 1325(a)(5); *In re Lum,* 1 B.R. 186, 5 B.C.D. 1039, 1 C.B.C.2d 95 (Bkrtcy, E.D.Tenn.1979). Section 1322(b)(2) creates an exception to that rule for a claim secured only by a security interest in the debtor's principal residence. The plan cannot provide for any less than maintenance of the regular payments. Worse treatment would "modify" the claimant's rights in violation of § 1322(b)(2).

> \*    \*    \*    \*    \*    \*

> [T]he court must point out that defaults to be cured within a reasonable time are not exactly like allowed secured claims. Under § 1325(a)(5)(B) an allowed secured claim is paid with interest to cover the time-value of money. The contract rate should not control the court's decision as to the rate of interest to be applied. See, e.g., *In re Benford,* 14 B.R. 157, 8 B.C.D. 117, 5 C.B.C.2d 79 (Bkrtcy, W.D.Ky.1981); *In re Klein,* 10 B.R. 657, 7 B.C.D. 668, 4 C.B.C.2d 412 (Bkrtcy, E.D. N.Y.1981). However, as to a claim secured only by the debtor's home, the general idea of § 1322(b)(2) is that the contract will remain in force as to the amount of payment. The claimant should be paid the interest after maturity for which the contract provides. The time-value of money is irrelevant. The court re-emphasizes tht § 1322(b)(2) creates a special exception to § 1325(a)(5)(B).

*In re Simpkins,* 16 B.R. 956, 6 CBC 2d at 1089–1090; 1091–1092 (Bkrtcy.1982).

The Court notes that *Simpkins* is not exactly on all fours with the instant case. First, in *Simpkins* the debt was due prior to the date of the last payment under the Chapter 13 plan. In the case *sub judice,* the debt was twenty-six (26) years from maturity. Second, the Court in *Simpkins* ultimately held that the protections of § 1322(b)(2) did not apply to the second mortgage because its collateral included certain personal property in addition to the debtor's principal residence. The contract before the Court is clearly protected from modification by § 1322(b)(2). Accordingly, much of the material cited from *Simpkins* is dicta. But, the material offers a sound interpretation of the interplay between

---

**2.** On the Court's own motion, a majority of the Judges in active service determined that the Court shall rehear this case en banc without oral argument. *Grubbs v. Houston First American Savings Association,* 718 F.2d 699 (5th Cir.1983).

§§ 1322(b)(2), (b)(3) and (b)(5) of the Bankruptcy Code.

Judge Kelley determined that Congress had two purposes for drafting these sections: (1) To allow Chapter 13 debtors to protect their homes by curing defaults and making regular payments on their mortgages; and (2) To protect lenders secured only by a security interest in the Chapter 13 debtor's home, especially long-term mortgages. See In re Simpkins, 16 B.R. 956, 6 CBC 2d at 1089. The legislative history relied upon by Judge Kelley to reach this decision dates back to the 1973 Report of the Commission on Bankruptcy Laws of the United States, reprinted in Appendix 2, Collier on Bankruptcy (15th ed. 1981) (hereinafter the 1973 Commission Report). The excerpts cited by Judge Kelley are reproduced in the footnotes.[3]

However, a more recent piece of legislative history has been cited by courts interpreting § 1322(b)(2)[4] in relation to § 1322(b)(5).[5] This excerpt, set forth immediately infra, has greatly facilitated the diverse application of Code sections 1322(b)(2), (b)(3) and (b)(5).[6]

**3.** The recommendation of the Commission was that: "The debtor be able to include in his plan a proposal for paying debts secured by liens on his residence and curing defaults thereon within a reasonable time." 1973 Commission Report, Part I at 13. The Commission commented that:

> Moreover, since Chapter XII of the present Act is not carried in any form into the new Act, there is no reason for continuing the exclusion of a debt secured by real property used as a residence from the relief available to a debtor who proposes to pay his debts out of future income. Accordingly, the Commission rcommends that the new Act authorize inclusion in any plan of ... provisions for curing defaults within a reasonable time and maintenance of payments while the case is pending on claims secured by a lien on a debtor's residence and on claims secured by personal property on which the last payment is due after completion by the debtor of all payments under the plan.

1973 Commission Report, Part I at 166. The proposed statute provided in Section 6–201(4) that:

> A plan ... may include provisions for the curing of defaults within a reasonable time and maintenance of payments while the case is pending on claims secured by a lien on the debtor's residence and on unsecured claims or claims secured by personal property on which the last payment is due after completion by the debtor or of all payments under the plan.

1973 Commission Report, Part II at 204. Explaining that subsection of the proposed statute, the Commission stated:

> Clause (4) is new and confers limited authority to deal with claims secured by a lien on the debtor's residence and long-term claims which cannot be paid under the plan. The authority given to cure defaults by provisions in the plan is in addition to the authority to cure defaults given to the trustee by § 4–102(a). This clause does not authorize reduction of the size or varying of the time of installment payments nor, except in instances where the last payment on a claim secured by a lien on the debtor's residence is due during the term of the plan, is it contemplated that the claim would be fully paid off under the plan. Any unpaid balance would not be covered by a discharge granted pursuant to § 7–207. But, while the debtor is operating under the plan, he may be able to employ the authorization given under this clause to preserve his equity in his home and keep current on long-term debt by provisions in the plan for curing defaults and maintaining payments....

1973 Commission Report, Part II at 205–206.

**4.** Bankruptcy Code § 1322(b)(2) provides that:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims;   .

**5.** Bankruptcy Code § 1322(b)(5) provides that:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
> (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.

**6.** The cases can be grouped into three categories:

> (I) Some cases hold that a debt secured by a mortgage on the debtor's residence may be cured and reinstated unless the last payment of the debt is due—without regard to acceleration—before completion of the Chapter 13 plan. These cases represent the closest adherence to the referenced remarks of Senator DeConcini and Representative Edwards. In re Taddeo, 9 B.R. 299, 7 CBC 422 (Bkrtcy.E.D.N.

Section 1322(b)(2) of the House Amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under section 1322(b)(5) of the House amendment.

124 Cong.Rec. S17–424 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini); 124 Cong.Rec. H11,106–11,107 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). Significantly, this so-called evidence of legisla-

Y.1981), aff'd, 15 B.R. 273, 5 CBC 2d 1309 (D.C.E.D.N.Y.1981), aff'd, 685 F.2d 24, 6 CBC 2d 1201 (2d Cir.1982); *Valente v. Savings Bank of Rockville,* 34 B.R. 362 (D.C.Conn.1983); *In re Hardin,* 16 B.R. 810, 5 CBC 2d 1320 (Bkrtcy. N.D.Tex.1982); *In the Matter of Canipe,* 20 B.R. 81, 6 CBC 2d 764 (Bkrtcy.W.D.N.C.1982); *In the Matter of Hubbard,* 23 B.R. 671, 7 CBC 2d 545 (Bkrtcy.S.D.Ohio 1982); *In re Davis,* 16 B.R. 473, 5 CBC 2d 610 (D.C.Kan.1981); *In re Rippe,* 14 B.R. 367 (Bkrtcy.S.D.Fla.1981); *In re Acevedo,* 9 B.R. 852 (Bkrtcy.E.D.N.Y.1981); *In re Beckman,* 9 B.R. 193, 7 BCD 361 (Bkrtcy.N. D.Iowa 1981).

The rationale of these cases is that modification of the mortgagees' rights is prohibited by § 1322(b)(2) unless the express exception to § 1322(b)(2) found in § 1322(b)(5) applies. However, *Simpkins* illustrates the anomaly of disallowing cure and reinstatement by a debtor who has equity in his residence and whose debt happens to become fully amortized during the period of the plan. *In re Simpkins,* 16 B.R. 956, 6 CBC 2d at 1086–87.

(II) Other cases hold that acceleration of the debt following a prepetition default precludes cure and reinstatement for the reason that the debt is immediately due, hence juxtaposition of § 1322(b)(5) against § 1322(b)(2) renders deacceleration an impermissible modification of the mortgagee's rights. *Grubbs v. Houston First American Savings Association,* 718 F.2d 694 (5th Cir.1983); *In the Matter of LaPaglia,* 8 B.R. 937, 3 CBC 2d 717 (Bkrtcy.E.D.N.Y.1981); *In the Matter of Garner,* 13 B.R. 799, 4 CBC 2d 1417 (Bkrtcy.S.D.N.Y.1981); *In re Land,* 14 B.R. 132, 5 CBC 2d 145 (Bkrtcy.N.D.Ohio 1981); *In re Williams,* 11 B.R. 504, 4 CBC 2d 1028 (Bkrtcy.S.D.Tex.1981).

To say that acceleration of the debt makes § 1322(b)(5) inapplicable strains the wording of the statute. The House intended the phrase

tive intent was relied upon by the Fifth Circuit Court of Appeals in *Grubbs* to disallow cure and reinstatement after the debtor had defaulted and the note was accelerated.

This Court takes into account the context in which the remarks, *supra,* were made. Sections 1322(b)(3) and (b)(5) of the major House bill (H.R. 8200) were identical to the corresponding sections in the major Senate bill (S. 2266). H.R. 8200 and S. 2266 reprinted in Appendix 3, *Collier on Bankruptcy* (15th ed. 1981). These sections provided that the plan may:

(3) provide for the curing or waiving of any default;

(5) provide for the curing of any default within a reasonable time and maintenance of payments while the case is pend-

"notwithstanding paragraph (2) of this subsection" to permit modification of the mortgage lender's rights to the extent necessary to cure a default when the last payment on the debt is due after the last payment under the Chapter 13 plan. The House must have intended the courts to look at the structure of the debt *prior* to acceleration, because the test is whether the "last" payment on the note is due after the last payment under the plan. *After* acceleration, there is no first, second or "last" payment—the entire debt is due and payable immediately.

These cases encourage a race to the courthouse by the debtor to file bankruptcy before the creditor exercises the contractual right to accelerate the debt. More importantly, in the opinion of this Court, these cases do injustice to the intent of Congress by judicially interpreting cure and reinstatement out of the Code.

(III) Finally, *Simpkins* takes the approach that cure and reinstatement of a long-term mortgage debt is authorized by § 1322(b)(3) in the event that the debt becomes due (without regard to contractual acceleration) during the term of the Chapter 13 plan. This Court has not yet had the opportunity to decide that issue, but the *Simpkins* approach is the most logical and the most consistent with Congressional intent.

Courts which feel compelled to read the statute literally need only look to § 1322(b)(3) for authority to permit cure and reinstatement of a mortgage debt, regardless of when the last payment on the debt is due vis-a-vis the last payment under the Chapter 13 plan. See *In re Rippe,* 14 B.R. 367, 369 (Bkrtcy.S.D.Fla.1981); *In re Soderlund,* 7 B.R. 44 (Bkrtcy.S.D.Ohio 1981).

Of course, both Judge Kelley and this Court reject the notion that prepetition acceleration vitiates the right to cure a default.

ing on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

*Id.* These sections unambiguously speak for themselves.

Subsection (b)(3) of the respective bills permits cure of *any* default, and subsection (b)(5) of the respective bills addresses cure of long-term debts. Congress gave long-term debts specific treatment under the Code because of their unique nature. Congress did not want the fact that payments of a long-term debt extend beyond the payment period of the plan to preclude the curing of defaults. However, Congress did not want a debtor to be able to discharge the long-term portion of a debt by providing for the debt under the plan. Nor did Congress want the courts to restructure long-term debts so that the entire balance would become payable during the term of the Chapter 13 plan. The solution conceived by Congress was that cure should be effectuated within a reasonable time; that the debtors should make current payments on the long-term debt; and that the long-term portion of the debt would be nondischargeable under § 1328(a)(1).

Ambiguity was injected into these sections as the House and Senate arrived at a compromise version of § 1322(b)(2). The House version of that subsection provided that the plan *may* modify the rights of holders of secured or unsecured claims. Had that version been adopted in the Code, cure and reinstatement would have been much simpler to interpret by the courts. But, the Senate version of subsection (b)(2) contained language in accordance with the desire of the 1973 Commission Report that the rights of mortgagees should not be subject to modification. The Senate version stated that the plan may modify the rights of unsecured claims or secured claims "other than claims wholly secured by mortgages on real property."

Unfortunately, the House—Senate compromise fell short of its mark. The House agreed to insert language into subsection (b)(2) to protect mortgage lenders with the understanding that the right to cure and reinstate mortgage debts would, nonetheless, not be jeopardized. See footnote 4. For this purpose, an introductory clause was inserted into subsection (b)(5) to the effect that "notwithstanding paragraph [b](2) of this subsection" long-term debts may be cured within a reasonable time so long as current payments are maintained. See footnote 5.

This final version of subsection (b)(5) works to preserve the right to cure and reinstate mortgage debts, except in two unanticipated situations: (1) The situation wherein the mortgage debt becomes fully amortized within the period of the Chapter 13 plan; and (2) The situation wherein the debt is accelerated upon default and the court determines that the last payment is no longer due after the date on which final payment under the plan is due.

This Court feels that the imprecise drafting of a legislative compromise should not be used to rewrite the statute in defiance of logic and legislative intent. In accordance with the foregoing assessment of legislative intent, the Court proceeds to analyze the seemingly antagonistic goals sought by Congress. The policy to permit a debtor to cure and reinstate a mortgage debt necessarily conflicts with the protection of the mortgagee's contractual rights, because cure and reinstatement involves a reversal of the creditor's contractual right to accelerate the debt upon default.

In a Chapter 11 case styled *In re Masnorth, supra,* this Court recognized the inherent conflict between the debtor's statutory right to cure and reinstate and the creditor's contractual right to acceleration:

> The cure and reinstatement of a mortgage that is in default necessarily alters a party's legal, equitable and contractual right under a contract. However, the cure of default and reinstatement of a mortgage is clearly contemplated by § 1124 of the Bankruptcy Code and is in furtherance of the congressional purpose of allowing debtors to reorganize. The fact that a debtor may cure and reinstate a mortgage does not mean that a debtor

may otherwise alter legal, equitable, or contractual rights between it and its creditor.

*In re Masnorth Corp.,* 28 B.R. at 894. In the Chapter 13 context, cure and reinstatement is expressly authorized by Bankruptcy Code §§ 1322(b)(3) and (5). The Court must reconcile these Chapter 13 cure and reinstatement provisions with § 1322(b)(2), which states that the Chapter 13 plan may not modify the rights of a holder of "a claim secured only by a security interest in real property that is the debtor's principal residence".

Cure and reinstatement may coexist with § 1322(b)(2) only if the inherent modification of creditors' rights is limited to that which is absolutely necessary to effectuate cure and reinstatement. Specifically, FFMC's right to acceleration must be subordinated to the debtor's right to deaccelerate the debt, cure the arrearages, and maintain current payments. In all other respects, the contract remains in force, unaltered by the provisions of the Bankruptcy Code.

The Court's Order adheres to this stricture as closely as possible by allowing interest on arrearages as provided in the contract. The operation of the Order is detrimental to the creditor in this case. However, it might hypothetically occur that a long-term mortgage note imposes an interest rate on arrearages which exceeds the current market interest rate. In such a situation, the creditor would be advantaged by the Court's decision to look to the terms of the contract rather than to § 1325(a)(5)(B)(ii) for the appropriate interest rate on arrearages. Clearly, a court in that hypothetical situation could not apply a lower interest rate under § 1325(a) than is specified in the mortgage contract, as that would be a modification of the contract in violation of § 1322(b)(2). The fact that FFMC did not adequately anticipate bankruptcy in drafting the mortgage contract before the Court does not persuade the Court to look beyond the terms of the contract to compensate FFMC for its loss of the time value of money.

FFMC is oversecured in the instant case. Section 506(b) of the Bankruptcy Code specifically permits an oversecured creditor to collect "reasonable fees, costs or charges provided under the agreement" under which FFMC's claim arises. Had FFMC's note and security deed provided for interest upon default, interest would have been collectible under § 506(b). Because FFMC's claim arises in the context of a cure and reinstatement, and FFMC is entitled to interest as provided for in its agreement with the debtor, the Court distinguishes FFMC's position from that of other creditors with allowed secured claims for which § 1325(a)(5)(B)(ii) compels payments over time equal to the present value of the allowed secured claim.

FFMC cites an opinion by the United States Court of Appeals for the Eleventh Circuit as authority for its position. *United States v. Southern States Motor Inns, Inc. (In the Matter of Southern States Motor Inns, Inc.),* 709 F.2d 647, 10 BCD 1470 (11th Cir.1983). The issue before the Court in *Southern States* concerned the appropriate interest rate to be applied to deferred payments of delinquent federal taxes under § 1129(a)(9)(C) of the Bankruptcy Code. The Bankruptcy Court calculated the proper interest rate by taking 12%, which was the then current interest rate established by 26 U.S.C. § 6621, and deducting 1% for the rehabilitation aspects of the Bankruptcy Code. The Eleventh Circuit Court of Appeals rejected this formula as an inadequate method for determining the interest rate which would pay the claimant the full present value of its claim.

Section 1129(a)(9)(C) provides that a priority tax claim by the IRS shall:

receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, a *value, as of the effective date of the plan, equal to the allowed amount of such claim.*

FFMC contends that *Southern States* is applicable to the instant case because the language highlighted in § 1129(a)(9)(C), *supra,* is substantially similar to the language in

§ 1325(a)(5)(B)(ii), which states that the Court shall confirm a Chapter 13 plan if, *inter alia,* a claimant retains the lien securing its claim and:

> (ii) the *value,* as of the effective date of the plan, of property to be distributed under the plan on account of such claim *is not less than the allowed amount of such claim;*

This Court agrees that, except in the situation of a cure and reinstatement as in the instant case, *Southern States* sets forth the factors relevant to determining an appropriate interest rate under § 1129(a)(9)(C) or § 1325(a)(5)(B)(ii).[7] However, the case before the Court does not represent the kind of "coerced loan" for which deferred payments must be discounted in order to give the claimant the full value of its claim.

As stated above, FFMC will receive what it bargained for. Its contract with the debtor remains in force as to reasonable fees, late charges or interest that might be charged against the debtor. Accordingly, a discount factor need not be applied to the arrearages due FFMC.

Granted, this holding produces an adverse result for FFMC, which did not bargain for interest to accrue on arrearages. The Court hereinabove conceived a hypothetical situation in which the interest rate assessed on arrearages exceeds the current market interest rate. Certainly, the Court would not be permitted to overlook the contract rate in order to "discount" the deferred payment of arrearages. To award the mortgagee less than the contract rate on arrearages would be an improper modification of the contract pursuant to § 1322(b)(2).

Because the claim of the IRS in *Southern States* was not determined by a contract enforceable beyond the date of confirmation, the Court finds that *Southern States* is not controlling in the instant matter. FFMC is entitled to receive all that it bargained for under the contract. In accordance with the foregoing, the Motion to Amend is hereby DENIED.

IT IS SO ORDERED.

### SUPPLEMENTAL ORDER

The Court enters this Opinion *sua sponte* in response to the recent publication of *In re Thorne,* 34 B.R. 428 (Bkrtcy.E.D.Tenn. 1983), an Opinion by Judge Kelley which arguably gives a new interpretation to his Opinion in *In re Simpkins,* 16 B.R. 956, 6 CBC 2d 1801 (Bkrtcy.E.D.Tenn.1982). This Court followed Judge Kelley's rationale in *Simpkins* to reach the conclusion that the mortgagee in the instant case is entitled to interest on arrearages in the situation of a cure and reinstatement under Chapter 13 only if the contract so provides. Judge Kelley does not retrench from his conclusion that the parties are bound to the contract; nor does this Court. However, Judge Kelley's Opinion in *Thorne* adds a judicial gloss to the terms of the contract with which this Court disagrees. The following explains how *Thorne* and *E.Z. Carr* follow the same analytical path—via *Simpkins*—to reach contrary results.

*Simpkins* states that § 1322(b) of the Bankruptcy Code creates an exception to the cram-down statute, § 1325(a)(5)(B); upon cure and reinstatement, the parties remain bound by the terms of the contract. *In re Simpkins,* 16 B.R. at 965. The second mortgage note in *Simpkins* provided for a $5.00 monthly late charge and the accrual of interest at 6% on defaulted payments. Applying the terms of this contract rather than the cram-down statute, Judge Kelley allowed the second mortgagee to collect the

---

**7.** The Eleventh Circuit approvingly cited the following excerpt from 5 *Collier on Bankruptcy* ¶ 1129.03, at 1129–65 (15th ed. 1982), for the factors relevant to determining an appropriate interest rate:

> The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*In the Matter of Southern States Motor Inns, Inc.,* 709 F.2d 647, 10 BCD at 1472.

late charges and 6% interest on the arrearages attributed to the second mortgage note.

The contract in *Thorne* does not provide for interest on the entire amount of past-due payments. Describing the terms of the contract, the Court stated:

> The promissory note provides for interest at 10% per year on the *unpaid principal* of the debt. [Emphasis added.]

*In re Thorne,* 34 B.R. at 430. This limited interest provision is not unlike the contract in *E.Z. Carr,* which provides for interest at 11.5% on the *unpaid principal* of defaulted payments. The divergence between *Thorne* and *E.Z. Carr* is that *Thorne* allows 10% interest on more than just the unpaid principal of the debt.

Under the terms of the deed of trust in *Thorne,* reasonable attorney's fees and advertising costs were added to the unpaid principal balance upon which Judge Kelley allowed 10% interest to accrue. That result is clearly required by the terms of the agreement, and this Court takes no exception to *Thorne* up to this point. But, *Thorne* goes one step further by permitting 10% interest on the *interest* component of the defaulted payments. This result is in neither the contract nor the language of the Bankruptcy Code. Accordingly, this Court cannot endorse the result in *Thorne.*

It is crucial for this Court to point out that the principal component of the arrearage in *E.Z. Carr* is but a fraction of the total arrearage claimed. As the debtor was only in his third year of repaying a thirty-year note, the bulk of his monthly payments constituted interest rather than principal. In fact, the mortgagee in *E.Z. Carr* did not bother to claim his entitlement to 11.5% interest on the defaulted principal because that claim only amounted to pennies.

The result in *Thorne* is exactly the same as that reached in *In re Stratton,* 30 B.R. 44, 10 BCD 726 (Bkrtcy.W.D.Mich.1983) and *In re Gregory,* 8 B.R. 256, 7 BCD 230 (Bkrtcy.S.D.N.Y.1981). However, both *Stratton* and *Gregory* take an approach to §§ 1322(b)(2) and 1325(a)(5)(B) which is contrary to the *Simpkins—E.Z. Carr—*

*Thorne* analysis. Both *Stratton* and *Gregory* hold that the cram-down statute is applicable to the arrearage claim by a mortgagee whose debt is being cured and reinstated pursuant to a Chapter 13 plan. Yet, both of those cases apply the contract rate of interest to the total amount of the arrearage claim rather than applying a market rate of interest, as required by § 1325(a)(5)(B).

In *Gregory,* the contract rate was used because the mortgagee agreed to a below-market rate of interest. The rationale in *Stratton* is much more difficult to comprehend, because the Court relied on the cram-down statute *and* concluded that the mortgagee's rights could not be modified. Therefore, *Stratton* used the contract rate of interest.

As this Court reads the statute, when § 1325(a)(5)(B) applies, the Court *must* apply the market rate of interest to give the creditor the present value of its claim. A decision by the Eleventh Circuit Court of Appeals so holds and is binding upon this Court. *United States v. Southern States Motor Inns, Inc. (In the Matter of Southern States Motor Inns, Inc.),* 709 F.2d 647 (11th Cir.1983). However, *E.Z. Carr* follows the reasoning in *Simpkins* that § 1322(b)(2) creates an exception to the cram-down statute, § 1325(a)(5)(B), and that the parties are bound by the terms of the contract. Hence, present value is irrelevant.

Judge Kelley has taken a middle ground on the interest issue in a Chapter 13 cure and reinstatement. Rather than deny interest on arrearages when the contract does not so provide, Judge Kelley has decided that the fairest and simplest approach is to deem the entire arrearage claim "unpaid principal". He then looks to the contract for the interest rate applicable to unpaid principal. In *Gregory, Stratton* and *Thorne,* the contract rate of interest represents a compromise in light of the higher market rate.

But the result in *Thorne* defies both the wording of the statute and the terms of the agreement between the parties. This Court

has found that § 1325(a)(5)(B) does not *require* interest on the claim for which a contract remains in force under which the creditor can adequately provide for the time value of money. By so holding, this Court endeavors to give fair treatment to the statute and to the bargain between the parties.