**In re TRI-GROWTH CENTRE CITY, LTD., a California limited partnership, Debtor.**

**IMPERIAL BANK, a California corporation, Moving Party,**

**v.**

**TRI-GROWTH CENTRE CITY, LTD., a California limited partnership; D.W. Unander, general partner; Dallas G. Wilborn, general partner; Richard Libenson, an individual; David Wiselman, an individual; Corrine Freedburg, an individual; and Does 1 through 50, inclusive, Respondents.**

**Bankruptcy No. 91-08548-H11. R/S No. 02441.**

United States Bankruptcy Court, S.D. California.

Feb. 3, 1992.

Michael P. Fedynyshyn, Gary B. Elmer, Wittman, Fedynyshyn & Roberts, San Diego, Cal., for debtor.

Daniel C. Minteer, Sue J. Hodges, Daniel S. Silverman, Pillsbury, Madison & Sutro, San Diego, Cal., for movant.

## MEMORANDUM DECISION

JOHN J. HARGROVE, Bankruptcy Judge.

This is a motion for relief from stay filed by Imperial Bank ("Imperial"), the first priority secured creditor.

This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157 and General Order No. 312–D of the United States District Court, Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G). Relief from the automatic stay is granted.

## FACTS

On January 5, 1987, Imperial made a three year loan in the principal amount of $2,300,000 to Tri–Growth Centre City, Ltd. ("debtor") to fund a take-out construction loan. The loan was used to build the 101 unit Downtown Budget Motel located on Columbia Street in San Diego, California. The take-out loan matured by its terms on January 5, 1990.

In early 1990, the debtor and Imperial entered into an agreement that extended the maturity date of the take-out loan to February 5, 1991. Thereafter, the parties entered into a forbearance agreement extending the loan maturity date to April 1, 1991. Upon the debtor's default, Imperial commenced both judicial and non-judicial foreclosure proceedings on the motel. This Chapter 11 proceeding followed on July 30, 1991.

Imperial offered uncontested evidence that in December 1991 the loan balance owed on its note was $2,411,399.05. Calculating the default rate of interest plus late charges, the loan balance would be $2,719,552.24. The record reflects that the debtor made no post-petition payments to Imperial.

Thomas O. Marshall, MAI ("Marshall"), testified on behalf of Imperial that the market value of the motel, plus an adjacent leasehold estate utilized for parking, was $2,800,000 as of May 15, 1991. On January 9, 1992, the final day of testimony in the relief from stay hearing, Marshall updated his appraisal based upon additional data that became available after the May 1991 appraisal.

In the revised appraisal, Marshall used a current income approach to value with a capitalization rate of 11% that was arrived at by sales of comparable properties and market trends. Marshall applied the 11%

capitalization rate to net operating income of $289,026 per year and reached a present market value of $2,627,500. After deducting for projected income shortfall, deferred maintenance and outside laundry costs for a total discount of $138,537, Marshall concluded that the present value of the motel "as is" was $2,490,000 as of December 31, 1991. In his calculations Marshall used a stabilized occupancy rate of 63% based on the presumption that the motel had received substantial refurbishment and added its own in-house laundry service. Marshall also presumed a stabilized average daily room rate of $33.00 per room.

Dallas Wilborn ("Wilborn"), Mark Grovesnor, and Ronald D. Ohrmund, MAI ("Ohrmund"), testified on behalf of the debtor.

Debtor's managing general partner Wilborn testified that the average daily room rate in December 1991 was actually $30.96. Amazingly, Wilborn didn't know the average daily room rate for 1990 or 1991. Wilborn also testified that the occupancy rate in December 1991 was 37% and was unsure what the occupancy rate was for the rest of 1991.

Mark Grovesnor, Chief Executive Officer of Grovesnor Hospitality Group, a hotel management company that has been managing the motel since April 1991, testified that the occupancy rate in 1990 was 58% and 56% in 1991. He further testified that the occupancy rate through 1991 averaged 55% at $31.00 per room.

Ohrmund testified that the "as is" value of the motel was $2,500,000 and that the value of the adjacent leasehold estate utilized by the motel for parking was $400,000. Ohrmund arrived at a total value of $2,900,000. In addition, Ohrmund opined another value of $3,500,000 to the fee interest based on a $300,000 capital infusion for deferred maintenance. Ohrmund conceded that most balcony carpeting needed to be replaced and that most of the rooms needed new carpeting, wall coverings and furniture.

Wilborn testified that he could foresee no problems in obtaining a conventional loan although he admitted that he had no loan commitment and that it was his understanding that either a Mr. Mark Grovesnor or the Grovesnor Hospitality Group would provide a cash infusion of some $300,000 to clean up the motel. Wilborn stated that under the reorganization plan the debtor would simply add all interest arrearages owed to Imperial and pay the interest on the combined balance from cash flow. Wilborn conceded that it would take 5–7 years to pay Imperial and that full payment would require a sale or refinance of the motel. No specific facts were given as to how Wilborn arrived at this opinion or whether a refinance sale was possible.

The debtor's operating reports filed for the period through November 30, 1991, revealed a slight post-petition operating profit of $12,666 exclusive of depreciation and amortization expenses and showed accrued interest of $104,534.24. On January 14, 1992, the date reserved for final argument, the debtor filed its plan of reorganization and disclosure statement. This court took the matter under submission to review the plan and disclosure statement as well as a purported seven year cash flow pro forma presented by the debtor without testimony at the same hearing.

## DISCUSSION

Section 362(d)(2) requires the court to grant relief from stay with respect to a stay of an act against property, if:

(A) The debtor does not have equity in such property; and

(B) Such property is not necessary to an effective reorganization.

■ Equity as used in the context of § 362(d)(2)(A) is the difference between the value of the debtor's interest in the property and the total of all encumbrances against it. *La Jolla Mortgage Fund v. Rancho El Cajon Associates*, 18 B.R. 283 (Bankr.S.D.Cal.1982). Imperial has the burden of proof on the issue of the debtor's equity in the property. Section 362(g)(1). This court finds that Imperial has met its burden.

■ Marshall's testimony was far more credible than debtor's appraiser Ohrmund.

This court finds that Marshall's updated appraisal valuing the debtor's motel as of December 1991 at $2,490,000 is the current market value of the motel. In reaching this valuation, Marshall utilized a stabilized occupancy rate of 63% and presumed that the problems of deteriorated carpeting and rooms had been corrected and that sufficient time had passed to permit the performance of the motel to improve. In addition, Marshall presumed a $33.00 average room rate. Marshall's evaluation is conservative considering that the actual occupancy rate in December was 37%; that the actual room rate was about $31.00; and that the occupancy rate through 1991 averaged 55% at $31.00 per room.

Ohrmund's $2,900,000 appraisal incorrectly included the ground lease valued at $400,000. The debtor did not own the ground lease. Further, Ohrmund conceded that his $3.5 million dollar appraisal presumed a contingent, future capital infusion into the property. He also admitted that he was not qualified to make such projections. Finally, Ohrmund stated that he did not deduct the debtor's ground lease payments in arriving at his projected net income from operations.

Both appraisers testified that hotel real estate values in San Diego have declined over the past year. The testimony previously discussed in this case reveals that the debtor's occupancy rate and room rate has declined over the past two years.

The motel is also subject to a second trust deed securing a loan of $250,000 against the property and delinquent real property taxes of approximately $48,000. Accordingly, secured debt against the debtor's motel approximates $2.7 million dollars, well over Marshall's appraised value of $2.5 million dollars and only $200,000 under Ohrmund's appraisal of $2.9 million dollars that included the value of the $400,000 leased parking lot. If Imperial's default interest is utilized, then total encumbrances against the property are slightly in excess of $3,000,000. Therefore, this court finds that the debtor's motel is overencumbered with secured debt.

■ Although the debtor does not have sufficient equity in its motel, it can still successfully defend Imperial's motion for relief from stay if it can show that the property is necessary to an effective reorganization.

■ Wilborn testified that the debtor's general plan was to continue to attempt to operate the motel after a capital infusion of between $150,000 to $300,000 provided by the Grovesnor Group. Wilborn stated that the debtor was attempting to sell the motel but had no offers after filing the petition.

At the January 9, 1992 hearing, Mr. Leon Hogg ("Hogg"), the president of Hallmark Management Associates, testified on behalf of the debtor stating that his corporation was interested in purchasing the motel for the purpose of converting it into a moderate income condominium complex. Hogg explained how financing for such a project could be obtained and indicated that it would take approximately 18 months to complete the conversion and sales of the condominiums. However, 5 days later, at argument on January 14, 1992, the debtor advised the court that it had abandoned its alternative plan of converting the hotel to moderate income housing and would stick with its original plan of operating the motel with a sale or refinance after 7 years in order to pay creditors.

The debtor's plan proposes to restructure Imperial's loan by adding all interest accrued to the effective date of the plan at the pre-default contractual rate to the principal balance of the loan and issuing a new 7 year note at 7% simple interest amortized over 20 years. The debtor classifies the new loan as a "cash flow loan," whose balance will be retired by way of either a refinance or sale at the end of 7 years.

In the interim, the new rate would provide for monthly installments of principal and interest. The amount of the principal payment on a monthly basis would be determined by subtracting the monthly interest payments on the note and 1/12 of the annual payments to the tax claims of the County of San Diego, junior liens of the Grovesnor Hospitality Group and the second trust deed holders, as well as payments

to general unsecured creditors. This court concludes that the debtor's attempt to force Imperial to accept a rewrite of its fully matured take-out loan fails the "fair and equitable" test under § 1129(b)(2)(A)(i)(I, II) and (b)(2)(A)(iii).

Assuming, which it might, that the debtor is able to obtain the consent of at least one impaired class of creditors and thereby satisfies § 1129(a)(10), it still must show by a clear and convincing burden of proof at confirmation that the plan does not "unfairly discriminate" and is "fair and equitable." *In re Hulen Park Place Ltd.*, 130 B.R. 39 (Bankr.N.D.Tex.1991) and *In re Future Energy Corp.*, 83 B.R. 470 (Bankr.S.D.Ohio 1988).

■ Although not per se objectionable, careful scrutiny must be given to a debtor's plan which proposes to convert a fully matured short term loan into permanent financing. In this case, the term of the original note is being extended 7 years. Based on this court's findings as to value, the initial loan to value ratio will be 100%. Debtor's disclosure statement projects the value of the motel at $4,045,454 at the end of 7 years. Unfortunately, the debtor fails to carry its burden on its extension plan.

The only expert testimony submitted was that of appraiser Ohrmund who admitted that he was not qualified to make projections as to future hotel revenues, occupancy rates and room rates. Debtor argues that this figure was deduced by using the income figures prepared by Imperial's appraiser Marshall. However, Marshall was never examined by the debtor on this point and his operating income value did not project for 7 years. The history of past operations of this property also reveals declining occupancy, room rates and operating revenues.

Although this is not a "negative amortization" case, Imperial's rewritten loan is only partially amortized over a 7 year term. The debtor attempts to shift the risks associated with a declining motel business on a secured creditor who did not bargain for those risks when it initially lent the funds. *In re D & F Construction, Inc.*, 865 F.2d 673 (5th Cir.1989). Debtor submitted no expert testimony regarding terms of bank loans currently being made for motel ventures. Mr. Grovesnor's brief testimony regarding a letter from Security Pacific Bank regarding financing at 7% on a 122 room motel is unconvincing regarding present market conditions for motel financing. *Matter of VIP Motor Lodge, Inc.*, 133 B.R. 41 (Bankr.D.Del.1991).

■ The debtor faces another substantial problem in regards to Imperial's default interest. The debtor argues that cure and compensation payments may be made in deferred cash payments commencing after the effective date of the Chapter 11 plan. However, this court concurs with the holding in *In re Jones*, 32 B.R. 951 (Bankr. D.Utah 1983), which held that § 1124(2) requires completion of a cure by the effective date of the plan. Although the phrase, "effective date of the plan" is not defined by the Code, most courts hold that it is the date of the entry of the order of confirmation.

■ Finally, the debtor's reliance on *In re Southeast Co.*, 868 F.2d 335 (9th Cir. 1989) and *In re Entz–White Lumber & Supply, Inc.*, 850 F.2d 1338 (9th Cir.1988) is misplaced. The debtor correctly states that *Southeast* and *Entz–White* stand for the proposition that if a debtor proposes a plan to "cure" its default, then the creditor is not entitled to a default rate of interest. Although not at issue in *Southeast* and *Entz–White*, implicit in the holdings in those cases is the fact that the cure required by § 1124 must be completed by the effective date of the plan if the default rate of interest is annulled. Accordingly, this court concludes that the debtor's plan does not "cure" Imperial's loan within the meaning of *Southeast* and *Entz–White* and that Imperial is entitled to be paid its default rate of interest which is approximately $538,000 thereby bringing Imperial's loan balance in excess of $2,700,000 vice the $2,400,000 + proposed to be paid by the debtor.

It is clear that the plan is defective on its face and that the debtor has failed to produce any competent evidence that its motel

operation can service Imperial's claim through "cash flow." This court concludes that the debtor has failed to carry its burden in demonstrating to this court that the motel can be effectively used to reorganize. The automatic stay shall lift.

## CONCLUSION

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052. Counsel for Imperial is directed to file with this court an order in conformance with this Memorandum Decision within ten (10) days from the date of entry hereof.