**In re Robert L. JOHNSON, Debtor.**

**Bankruptcy No. 4–93–4098.**

United States Bankruptcy Court, D. Minnesota.

July 3, 1995.

Michael L. Meyer, Ravich, Meyer, Wilson, Kirkman, McGrath & Nauman, Minneapolis, MN, for debtor.

Jacqueline Layton, Ronald M. Goldberg, Faegre & Benson, Minneapolis, MN, for Prudential Ins. Co.

## *MEMORANDUM ORDER SUSTAINING DEBTOR'S LIMITED OBJECTION TO CLAIM NO. 19*

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 5th day of April, 1995 on an objection to Claim No. 19 filed by The Prudential Insurance Company of America ("Prudential"). Appearances were as follows: Michael Meyer for the debtor, Robert Johnson ("Debtor"); and Jacqueline Layton and Ronald Goldberg for Prudential. The Court having heard the arguments of counsel and being duly advised in the premises issues the following Memorandum Order.

### *FACTS*

1. On February 22, 1985, Debtor and Prudential entered into a Promissory Note ("Note") in the original principal amount of $9,000,000 secured by a mortgage on real property located at 6300 Olson Memorial Highway.

2. Article 4 of the Note provides:

During any period in which an Event of Default, as defined in Section 6.1 of this Note, exists, ... Makers shall pay, with respect to any principal on this Note which is not paid when due and any principal on the Note which is declared due and payable upon occurrence of an Event of Default (collectively, the "Delinquent Principal"), as interest in addition to the interest payable in accordance with Article 2 of this Note, an amount equal to the amount by which (i) interest on the Delinquent Principal outstanding during the period in question calculated at the rate of 14.625 percent per annum, exceeds (ii) interest payable on the Delinquent Principal under Article 2 with respect to the period in question.

Article 2 of the Note provides for a nondefault rate of interest at 12.625 percent per annum. This nondefault rate represents a difference of two percent from the default rate at 14.625 percent.

3. The Note further provides that "Lender and Makers agree that the additional interest payable pursuant to this [Article] 4 is a reasonable payment for the increased risk to Lender's investment which exists by virtue of the Event of Default." Article 9.2 states that "Makers agree to pay all costs incurred by Lender in collecting any payment due under this Note, including reasonable attorneys' fees." Finally, Article 10 allows Prudential to recover interest on the expenses incurred in collecting on the Note.

4. On approximately November 1, 1991, Debtor defaulted on the Note. On April 1, 1992, the Note matured by its own terms. Debtor has not made payment on the Note since November, 1992.

5. On July 9, 1993, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6. Prudential filed a secured claim against Debtor based on the Note. Prudential is an oversecured creditor. The prepetition portion of the secured claim consists of the following elements:

| | |
|---|---|
| Principal | $ 8,764,669.95 |
| Interest at the Contract Rate to the First Default Date (December 1, 1991) | $ 92,211.63 |
| Interest at the Penalty Rate from December 1, 1991 through July 9, 1993 | $ 2,057,956.51 |
| Prepetition Attorneys' Fees and Advances | $ 31,209.90 |
| Interest on Prepetition Attorney Fees at the Penalty Rate | $ 1,947.35 [1] |
| **TOTAL** | **$10,947,995.35** [2] |

In addition, Prudential had incurred $98,869.59 as of December 31, 1994 in postpetition attorneys' fees and advances, plus interest.

---

**1.** Article 4 of the Note provides for a default rate of interest only on the principal. Debtor does not, however, object to Prudential applying a default rate of interest to prepetition attorneys' fees.

**2.** The original amount of Prudential's claim was $10,960,404.12. This amount was later modified based on calculations by Prudential.

7. By Order dated March 3, 1995, the Court confirmed Debtor's Modified Plan of Reorganization ("Plan"). Section 3.2(a) of the Plan lists Prudential's claim in the amount of $13,103,826.94, plus reasonable attorneys' fees, as of December, 31, 1994. This amount represents Prudential's prepetition claim, postpetition interest on that claim at the nondefault rate of interest, and postpetition expenses. A footnote clarifies that Prudential asserts the amount of its claim as $13,427,767.63, plus attorneys' fees. This amount includes postpetition interest on the entire prepetition claim at the default rate.

8. Section 3.2(b) of the Plan states, "On or before the later of March 31, 1995 or the Effective Date, Debtor will refinance the Olson Highway Property.... At the time of such refinancing, Prudential's Class 2 claim will be paid in full." Upon anticipated refinancing of the Olson Highway Property there will be sufficient funds to pay the amount claimed by Prudential.

9. Debtor objected to Prudential's claim to the extent Prudential sought postpetition interest at the default rate on its prepetition secured claim. According to Debtor, Prudential is only entitled to interest at the nondefault rate on its entire prepetition secured claim. At the hearing on this motion, Prudential made clear that it was not seeking postpetition interest at the default rate on any portion of its prepetition claim that included interest; instead, with regard to the interest that accrued prepetition on the principal and the attorneys' fees, it only seeks postpetition interest at the nondefault rate. Prudential is, however, seeking postpetition interest at the default rate on the principal and attorneys' fees portion of its prepetition claim. Thus, if the default rate is the applicable rate, the amount of Prudential's claim will be less than $13,427,767.63.

### ISSUE

The sole issue is whether Prudential, as an oversecured creditor, is entitled to be paid postpetition interest on the principal and attorneys' fees portion of its prepetition claim at the default rate or the nondefault rate where the debt has matured by its own terms prepetition and the Plan cures all defaults on the debt.

### DISCUSSION

#### A. The Rights of an Oversecured Creditor

Pursuant to § 502 of the Code, if a claim is objected to, the court should allow the claim except to the extent that, among other things, the claim is for unmatured interest. 11 U.S.C. § 502(b)(2). Section 506(b) is an exception to this rule. It provides that an oversecured creditor is entitled to postpetition "interest on its claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose" to the amount of the value of the collateral. *Id.* at § 506(b). Neither this section nor the legislative history, however, indicate what the interest rate shall be. *See Bradford v. Crozier (In re Laymon),* 958 F.2d 72, 75 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 328, 121 L.Ed.2d 247 (1992).

In *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Supreme Court, in focusing on the plain language of § 506(b), reasoned that the phrase "interest on such claim" is *not* limited by the subsequent language "provided for under the agreement under which such claim arose." As such, the Court concluded that, unlike an award of fees, costs or charges, the grant of interest is not dictated by the loan agreement. *Id.* at 242, 109 S.Ct. at 1030–31. The Court, however, failed to articulate what the appropriate rate of interest should be under § 506(b).

As a consequence, courts have been left to struggle with the issue of whether an oversecured creditor is necessarily entitled to a contractually bargained-for default rate of interest and under what circumstances such an award is appropriate. The commentators have likewise addressed the issue. Some assert that Congress must have intended the bankruptcy courts considerable leeway in deciding the applicable rate of postpetition interest, *see, e.g.,* Paula A. Franzese, *Secured Financing's Uneasy Place In Bankruptcy: Claims for Interests in Chapter 11,* 19 Hofstra L.Rev. 1 (1990), while others assert that bankruptcy courts have no choice but to enforce a contracted-for higher default rate.

*See, e.g.,* Craig H. Averch et al, *The Right of Oversecured Creditors to Default Rates of Interest From a Debtor in Bankruptcy,* 47 Bus.Law. 961 (1992).

■ The difficulty in analysis is exacerbated by the pre-Code law. Prior to enactment of the Bankruptcy Code, secured creditors generally did not fare well in bankruptcy. There was no clear legislative mandate allowing for postpetition interest to an oversecured creditor and unmatured interest in general was not recoverable. *See Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *Laymon,* 958 F.2d at 74 ("courts applied a general rule that the accrual of interest on claims against the bankruptcy estate was suspended from the date the petition was filed."). Despite this lack of guidance, courts tended to allow postpetition interest to oversecured creditors—but not as a matter of right. *See Laymon,* 958 F.2d at 75 (discussing the pre-Code law). When § 506(b) was enacted, Congress shifted to a specific legislative allowance, but failed to qualify the applicable rate of interest by omitting after the word "interest" the qualifier "as provided for by the agreement." This leaves to the bankruptcy court considerable leeway in determining the rate of interest to be awarded to oversecured creditors.

### B. *The Applicable Rate of Interest Under § 506(b)*

#### 1. *General Equitable Standards*

■ Most courts have correctly construed *Ron Pair* and § 506(b) to require analyzing default rates based on the facts and equities of a case.[3] Stated differently, bankruptcy courts recognize a presumption in favor of the parties agreed interest rate subject to rebuttal based upon equitable considerations. *See In re Terry Ltd. Partnership,* 27 F.3d 241, 243 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 360, 130 L.Ed.2d 313 (1994); *Laymon,* 958 F.2d at 75; *Fischer Enters., Inc. v. Geremia (In re Kalian),* 178 B.R. 308, 314 (Bankr.D.R.I.1995); *Foss v. Boardwalk Partners (In re Boardwalk Partners),* 171

B.R. 87, 91 (Bankr.D.Ariz.1994); *In re Consolidated Properties Ltd. Partnership,* 152 B.R. 452, 454 (Bankr.D.Md.1993); *In re Hollstrom,* 133 B.R. 535, 539 (Bankr.D.Colo. 1991); *In re DWS Invs., Inc.,* 121 B.R. 845, 849 (Bankr.C.D.Cal.1990); *In re W.S. Sheppley & Co.,* 62 B.R. 271, 278 (Bankr.N.D.Iowa 1986).

■ Courts have considered a handful of factors when deciding whether to enforce a contractual default rate as opposed to a nondefault rate. These factors include: (1) the difference between the default and nondefault rates; (2) the reasonableness of the differential between the rates; (3) the relative distribution rights of other creditors and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; and (4) the purpose of the higher interest rate. Specifically, does the default rate merely compensate the creditor for any loss resulting from the nonpayment of the principal at maturity, or is it a disguised penalty? *See Kalian,* 178 B.R. at 316; *Invex Holdings, N.V. v. Equitable Life Ins.,* 179 B.R. 111, 115 (N.D.Ind. 1993), *aff'd sub nom. In re Terry,* 27 F.3d 241 (7th Cir.1994); *Hollstrom,* 133 B.R. at 541.

If I were to decide Prudential's entitlement to the default rate solely by this test, I would find that allowance of the default rate is not inequitable. The difference between the default and nondefault rate is only two percent—which is both small and reasonable. Further, enforcement of the default rate would not adversely affect other creditors. Debtor and the RTC, the other major secured creditor who holds a second mortgage on the Olson Highway Property, have reached a settlement pursuant to which the RTC will receive $5 million on behalf of its claims. This amount is not contingent on Prudential's recovery. Moreover, any payment to the unsecured creditors does not depend on Prudential's claim. Finally, the two percent increase in interest is not a penalty.

---

**3.** However, in *In re Martindale,* 125 B.R. 32 (Bankr.D.Idaho 1991), the court held that it had no license to disregard the contractual provisions providing for a default rate of interest. *Id.* at 37.

### 2. When the Plan "Cures" the Default

■ Using the previous test, however, does not contemplate a subsequent "curing" of a default. Instead, the test presumes a default has occurred and remains. However, when after a default a plan provides for full payment of an oversecured claim and restores the parties to the *status quo ante*, a different and even more significant factor is introduced into the equitable equation. That is, does the cure of a default under a plan have any impact on the allowable interest rate under § 506(b)?

■ Section 1123(a)(5) states that a plan shall "provide adequate means for the plan's implementation, such as ... curing or waiving of any default." 11 U.S.C. § 1123(a)(5). While the term "cure" is not defined in the Code, courts generally agree that "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions." *Great W. Bank & Trust v. Entz–White Lumber & Supply, Inc. (In re Entz–White Lumber & Supply, Inc.),* 850 F.2d 1338, 1340 (9th Cir.1988) (quoting *Di Pierro v. Taddeo (In re Taddeo),* 685 F.2d 24, 26–27 (2d Cir.1982)). Stated differently, a cure returns the parties to the *status quo ante* by paying all arrearages on the debt and reinstating the debt's original payment terms. *Id.; accord Taddeo,* 685 F.2d at 26; *Downey Sav. & Loan Ass'n v. Metz (In re Metz),* 820 F.2d 1495, 1497 (9th Cir.1987); *In re Clark,* 738 F.2d 869, 872 (7th Cir.1984). Courts also generally agree that a cure nullifies all consequences of the default—including the higher postdefault interest rate. *Florida Partners Corp. v. Southeast Co. (In re Southeast Co.),* 868 F.2d 335, 338 (9th Cir.1989); *Entz–White,* 850 F.2d at 1342; *In re Countrywood Inv. Group, Ltd.,* 117 B.R. 338, 339 (Bankr.M.D.Tenn.1990); *Levy v. Forest Hills Assocs. (In re Forest Hills Assocs.),* 40 B.R. 410, 414 (Bankr.S.D.N.Y.1984).

The concept of cure arises in many contexts under the Code. One such context is the impairment of a claim. Impairment deals with the right to vote on the confirmation of a plan. Pursuant to § 1124(2), a debtor may unimpair an accelerated debt by curing the default (deaccelerating the debt), reinstating the maturity date, compensating the holder for any damages incurred, and not altering any other rights. *See* 11 U.S.C. § 1124(2). Courts addressing the entitlement of interest at a default versus nondefault rate under § 506(b) have held that, by analogy to § 1124(2), when the debtor satisfies all elements of § 1124(2), the debtor has cured the default, and therefore need not pay the default rate of interest.[4] *See, e.g., United States Trust Co. v. LTV Steel Co. (In re Chateaugay Corp.),* 150 B.R. 529, 543 (Bankr. S.D.N.Y 1993), *aff'd,* 170 B.R. 551 (S.D.N.Y. 1994); *In re PCH Assocs.,* 122 B.R. 181, 199–200 (Bankr.S.D.N.Y.1990).

Here, the debt matured by its own terms prepetition. Thus, Debtor cannot deaccelerate the debt under § 1124(2). Yet, just because the debt was not accelerated does not mean that Debtor cannot "cure" the default. Section 1124(2) does not define a cure; a cure is only one requirement to making a claim unimpaired. Under the terms of the Plan, Debtor has paid Prudential the full amount of the matured principal, all prepetition interest and charges at the default rate (with the exception of the interest that accrued prior to December 1, 1991—the date of the default), as well as postpetition interest on that debt at the nondefault rate. This payment returned the parties to the *status quo ante* as of the petition date, and is therefore a true cure. Because the payment under the Plan is a full cure, it nullifies all

---

4. Other decisions have held that a claim may be unimpaired under § 1124 even if the debt matured by its own terms prior to the petition date, since § 1124(2) does not apply only to accelerated debts. According to these decisions, when a matured claim meets all the requirements of § 1124, the claim is unimpaired and the oversecured creditor is not entitled to postpetition interest at the default rate. *See In re Southeast Co.,* 868 F.2d at 338; *Entz–White,* 850 F.2d at 1342. In going one-step further, the court in *Entz–*

*White* disallowed the default interest rate from the original maturity date, therefore depriving the creditor of the higher rate prepetition. *Entz– White,* 850 F.2d at 1342.

The issue here is not whether a claim is or is not impaired for purposes of voting on a plan, however. The issue is whether the debtor has cured any default, thereby nullifying the consequences of the default and preventing the oversecured creditor from receiving postpetition interest at the default rate.

consequences of the default, and accordingly Prudential is unable to be accrue interest postpetition at the default rate. Whether the debt matured by its own terms or was accelerated and deaccelerated is irrelevant to the analysis.

Moreover, the equities mandate that the nondefault rate be enforced. Prudential has not suffered, but has been amply made whole up through the petition date as it received everything provided for in the Note, including interest at the default rate. Prudential is getting the full benefit of its bargain.

### CONCLUSION

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Debtor's limited objection to Claim No. 19 filed by Prudential is SUSTAINED; and

2. Prudential is entitled to accrue postpetition interest on the principal and attorneys' fees portion of its prepetition claim at the nondefault rate of interest of 12.625 percent.