In re CASA BLANCA PROJECT
LENDERS, L.P., Debtor.

CASA BLANCA PROJECT LENDERS,
L.P., Appellant,

v.

CITY COMMERCE BANK,
and Community Bank,
Appellees.

BAP No. CC–95–1345–VHM.
Bankruptcy No. ND 93–12987–RR.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Jan. 17, 1996.

Decided April 30, 1996.

Martin P. Cohn, Santa Barbara, CA, for Appellant.

William C. Beall, Santa Barbara, CA, for Appellees.

Before: VOLINN, HAGAN, and McKEAG,[1] Bankruptcy Judges.

## *OPINION*

VOLINN, Bankruptcy Judge:

### OVERVIEW

The Chapter 11 debtor appeals an order granting an over-secured creditor default interest where the creditor received full payment of its principal, interest at the pre-default rate, costs and attorneys' fees. The trial court awarded the creditor the higher interest rate because the collateral was sold pursuant to § 363 of the Bankruptcy Code rather than in the context of a plan of reorganization.[2] We reverse and remand.

### FACTUAL BACKGROUND AND PROCEEDINGS

The debtor, along with a consortium of lenders, held a second position deed of trust on certain real property located in Santa Barbara, California. The debtor, a limited partnership, and its associates, in a high risk, high interest loan exceeding 30 percent, had advanced over $850,000 to the original owner-borrowers. The property was undeveloped and could only be sold as a single lot. The original equity holders and borrowers, Frank and Lorraine Serena, defaulted and the consortium foreclosed and purchased the property at a trustee's sale. City Commerce Bank (the "Bank") was the holder of the first-position deed of trust, securing a note dated January 22, 1988 in the amount of $2,300,000. The Bank subsequently initiated foreclosure proceedings. To prevent loss of the property through a trustee's sale, the debtor, on or about August 28, 1993, filed for protection under Chapter 11 of the Code. In its schedules, the debtor listed approximately $49,000 in unsecured debt and $913,690.71 in secured debt. All of the secured debt was owed to the Bank. The debtor's enumerated assets were the real property valued at $1,530,000 and a negligible amount of personal property. On this record, and as it turned out, the bank was oversecured.

Within a month after the petition was filed, the Bank moved for relief from stay. The motion was granted subject to a 90–day moratorium in order to allow the debtor to sell the entire property to a previously-identified purchaser. The sale did not close, but to prevent foreclosure, the debtor filed a complaint for injunctive relief and a temporary restraining order. The litigation resulted in a series of preliminary injunctions which gave the debtor time to obtain approval from the California Department of Real Estate to subdivide the property into eight individual lots. As a condition of the stay of foreclosure, the debtor was required to make adequate protection payments to the Bank in the amount of $31,000 to $35,000 every six weeks. This sum was equivalent to interest at the non-default rate. Because of the Bank's pressure for immediate liquidation,

1. Hon. Jane Dickson McKeag, Bankruptcy Judge for the Eastern District of California, sitting by designation.

2. Unless otherwise stated, all references to "sections" and "rules" refer to the U.S. Bankruptcy Code, 11 U.S.C. § 101 et seq.

the lots were sold under § 363, rather than pursuant to a plan of reorganization.[3]

After the sale of each lot, the Bank was also paid the net sale proceeds. The debtor ultimately sold six of the eight lots. The proceeds were sufficient to both reimburse the Bank's costs and pay its outstanding principal plus interest at the non-default rate.

As an oversecured creditor under § 506(b), the Bank sought further interest at a default rate and attorneys' fees of $29,500.[4] The base variable interest rate on the note was prime plus 2 percent, which at the outset amounted to 9 percent. Presumably, the variable rate reflected changes in the market interest rate. The note provided that in the event of default, the interest rate would be increased by 7 percent. The record shows that the prime plus two figure created a variable interest rate which ranged between 9.5 and 12.5 percent. Therefore, the default rate would, presumably, range between 16.5 and 19.5 percent. The total amount of default interest was an additional $266,979.01, which the Bank sought from the sale of the remaining lots. The net proceeds are projected to be over $550,000. The debtor objected to the Bank's request because it wished to apply the additional proceeds to recoupment of some of its investment as it would have been entitled to do under a Chapter 11 plan pursuant to § 1129(b)(2), discussed below. The court ordered all funds in excess of the non-default rate to be held in trust until the issue was resolved. The Bank then brought a motion to disburse these proceeds to pay off the balance, which, as indicated, consisted of accrued default interest.

The court held that because the sales did not take place pursuant to a plan of reorganization, the obligation to the Bank was not "cured." Without a legal cure, the court concluded that the Bank was entitled to attorneys' fees and interest at the default rate. An evidentiary hearing was held on April 24, 1995, to determine the propriety of the default interest rate and the Bank's attorneys' fees. The court found the interest and fees reasonable and ordered them paid. The debtor timely appealed the court's order.

The debtor asserts that payment to the Bank constitutes a cure regardless of whether it occurs outside of, or pursuant to, a plan of reorganization. As such, the debtor claims that default interest is not owing because a cure nullifies all consequences of default, including the increased interest rate. The debtor further argues that equity demands that the court disallow the higher rate in this instance.

## ISSUES

1) Whether a defaulted obligation to an oversecured creditor is cured in Chapter 11 where the creditor receives a return of principal plus interest at the pre-default rate after a sale of the collateral pursuant to § 363.

2) Whether equity requires that the pre-default rate of interest be imposed in order to allow for a distribution to the debtor.

## STANDARD OF REVIEW

 Whether a cure can occur pursuant to a sale under § 363 is a question of statutory interpretation and is reviewed *de novo*. *In re Southeast Company*, 81 B.R. 587 (9th Cir. BAP 1987), *aff'd*, 868 F.2d 335 (9th Cir.1989). A trial court's findings of fact are reviewed under the clearly erroneous standard. *In re Johnston*, 49 F.3d 538 (9th Cir.1995).

## DISCUSSION

### Relationship of State and Federal Law

 A creditor is not entitled to postpetition interest under the Bankruptcy Code unless it is oversecured. 11 U.S.C. § 506(b).[5]

---

3. Section 363 provides, in pertinent part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

4. Although the debtor initially objected to the Bank's attorneys' fees, it did not preserve the issue on appeal.

5. Section 506(b) provides, in pertinent part, that an oversecured creditor is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under

Even where interest payments are appropriate, however, neither the Code nor the applicable legislative history indicate what the rate should be.

■ We note that, as a rule, bankruptcy courts apply state law when analyzing a debtor's interest in property. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). However, this case requires the application of bankruptcy rather than state law because the issue before the panel involves payment of the Bank's secured claim, not the debtor's interest in property. *Vanston Bondholders Protect. Comm. v. Green,* 329 U.S. 156, 162, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) ("In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits"); *see also United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989) (language of § 506(b) does not require that interest be applied as provided in the loan agreement).

■ A bankruptcy filing works a substantial modification of the relationship between contracting parties. A creditor who seeks enforcement of a contract interest rate in bankruptcy must show that to do so would allow for equitable distribution of estate property among creditors and would not impede the debtor's ability to make a fresh start. *Vanston,* 329 U.S. at 165, 67 S.Ct. at 241 ("It is manifest that the touchstone of each decision on allowance of interest in bankruptcy . . . has been a balance of equities between creditor and creditor [and] between creditors and the debtor").

In keeping with *Vanston* and *Ron Pair,* bankruptcy courts considering the issue generally apply the contract rate subject to rebuttal based upon equitable considerations. *See, e.g., In re Terry Ltd. Partnership,* 27 F.3d 241, 243 (7th Cir.), *cert. denied sub nom.,* —— U.S. ——, 115 S.Ct. 360, 130 L.Ed.2d 313 (1994); *In re Boardwalk Partners,* 171 B.R. 87, 91 (Bankr.D.Ariz.1994); *In re DWS Investments, Inc.,* 121 B.R. 845, 846 (Bankr.C.D.Cal.1990); [6] *In re Hollstrom,* 133 B.R. 535, 537 (Bankr.D.Co.1991). When default interest is at issue, this approach allows a court to examine the specific facts of each case and determine whether the circumstances warrant application of the higher rate.

*The effect of a cure of a default*

The above analysis, however, does not take into account the proper course when a debtor cures the default.[7] When a plan provides for the complete cure of an oversecured obligation, a court must also determine whether the higher default rate is allowable under § 506(b). Courts generally hold that a cure "nullifies all consequences of the default—including the higher postdefault interest rate." *In re Johnson,* 184 B.R. 570, 574 (Bankr.D.Minn.1995) (citing *In re Southeast Co.,* 868 F.2d 335, 338 (9th Cir.1989)). Thus, a cure pursuant to a plan of reorganization prevents application of default interest. *In re Southeast Co.,* 868 F.2d at 338 (claim unimpaired under § 1124(2), creditor not entitled to postpetition interest at default rate); *In re Entz–White Lumber & Supply, Inc.,* 850 F.2d 1338, 1342 (9th Cir.1988) ("and by curing the default, Entz–White is entitled to avoid all consequences of the default—including higher post-default interest rates").

which such claim arose" up to the value of the collateral. 11 U.S.C. § 506(b); *see In re Johnson,* 184 B.R. 570 (Bankr.D.Minn.1995).

6. "[T]he Supreme Court has held that contractual and other legally-established rights may sometimes conflict with equitable principles of distribution under the bankruptcy laws." *In re Hollstrom,* 133 B.R. 535, 537 (Bankr.D.Co.1991), citing *In re W.S. Sheppley & Co.,* 62 B.R. 271, 274 (Bankr.N.D.Iowa 1986).

7. A cure of "a default commonly means taking care of the triggering event and returning to pre-

default conditions." *In re Entz–White Lumber & Supply, Inc.,* 850 F.2d 1338, 1340 (9th Cir.1988), quoting *In re Taddeo,* 685 F.2d 24, 26–27 (2d Cir.1982). A cure "effect[s] a total healing of the scars of contractual default, by placing the parties into the same position they were in immediately before the default occurred. This healing is accomplished by paying the creditor whatever monies he would have received under the contract had the debtor not defaulted. . . . [The creditor] is thereby given the full benefit of the original bargain." *In re Forest Hills Associates,* 40 B.R. 410, 415 (Bankr.S.D.N.Y.1984).

The foregoing cases arose in the context of plans of reorganization whereas the instant case arises in the context of a series of § 363 sales (albeit in a Chapter 11 case). In none of these cases was the issue of cure under § 363 rather than under a plan squarely before the court.

One of the leading cases interpreting the concept of cure is *In re Taddeo,* 685 F.2d 24 (2d Cir.1982). In *Taddeo,* the court held that de-acceleration of a defaulted secured debt ensued upon cure under § 1322 although the remedy was not specifically referenced in the statute. The court reasoned:

> the power to cure must comprehend the power to "de-accelerate." This follows from the concept of "curing a default." A default is an event in the debtor-creditor relationship which triggers certain consequences—here, acceleration. Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code.

*In re Taddeo,* 685 F.2d at 26–27.

The *Taddeo* court then proceeded to discuss § 365 and § 1124, and concluded that " 'curing a default' in Chapter 11 means the same thing in Chapters 7 or 13: the event of default is remedied and the consequences are nullified." *Id.* at 29. The Ninth Circuit cited *Taddeo* with approval in *In re Entz–White Lumber and Supply, Inc.,* 850 F.2d 1338 (9th Cir.1988), where it similarly held that "the underlying concept of cure is the same throughout the Bankruptcy Code." *Id.* at 1340 n. 1.

Subsequently, the issue was considered in *In re 433 South Beverly Drive,* 117 B.R. 563 (Bankr.C.D.Ca.1990), where a Chapter 11 debtor moved to sell certain real property free and clear of liens pursuant to § 363. The debtor proposed to make full payment on defaulted obligations to two oversecured creditors. The debtor sought a court ruling that payment of the principal, costs and pre-default interest constituted a cure, thereby alleviating the accrual of default interest. The creditors objected, arguing that a cure which relieved the debtor of its obligation to pay default interest was only available in the context of a plan. The court disagreed.

In discussing *Entz–White* and *Southeast,* the court reasoned that the central issue in each case was not whether full payment occurred pursuant to a plan, but whether the cure was sufficient to nullify the incidents of default. The court held that a "cure," as applied in *Entz–White* and *Southeast,* arose whenever an obligation was paid in full because:

> The concept of "cure" is not exclusive to Chapter 11 or plans of reorganization. . . . [All] references to cure involve a determination of the amount of a creditor's claim which is allowable and ultimately payable in a bankruptcy proceeding, provided that assets prove to be sufficient. That is the same issue presented in the instant case. Absent some compelling reason to the contrary, the construction of "cure" and its application to the allowed amount of a creditor's claim should not differ depending on whether it arises under a plan or in some other context in the Bankruptcy Code.

*In re 433 South Beverly Drive,* 117 B.R. at 566–567.

Applying this reasoning, the court held that the debtor's proposed § 363 sale would effect a cure. The same logic applies with greater force to the case at bar.[8] Here, the creditor has been fully paid pursuant to a series of § 363 sales. On the record before us, it appears to have received the full pre-default benefit of its bargain and to have been made whole for losses, such as attorneys' fees, stemming from the event of default. While the sales were not made pursuant to a plan, they were made during the course of a Chapter 11 proceeding, resulting

---

8. Chapter 11 permits a plan of liquidation as an alternative to reorganization. Thus, § 1123(b)(4) states that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." There is no apparent reason why the equitable consequences should differ for a secured creditor or the debtor whether the liquidation is performed under § 363 or under § 1123. We also note that § 1123(b)(4) provides for distribution of proceeds to "holders of claims or interests."

in what turned out to be, in substance, a *de facto* liquidation plan or the groundwork for a proposed plan to pay off all creditors in full.

*Post-cure interest rate*

In keeping with its analysis of cure, the court in *Beverly Drive* declined to apply the default interest rate. The court, however, considered whether to impose a rate other than the pre-default contract rate. In resolving this issue, it followed the guidelines articulated in *In re Terry Ltd. Partnership* and *Entz–White.*

*Terry* interpreted *Ron Pair* to require a bankruptcy court to apply the contract rate in a default situation unless the equities dictated otherwise. In *Entz–White,* the Ninth Circuit Court of Appeals held that the same considerations governed where a default was cured, except that the applicable contract rate was the pre-default rate, not the default rate. The court further suggested that a logical reading of § 506(b) was that interest should be set at the pre-default contract rate or the market rate, whichever was higher. *Id.* at 1343. However, this statutory interpretation was qualified. The court explained, "[w]e continue, of course, to recognize bankruptcy courts' 'broad equitable discretion' in awarding post-petition interest." *Id.* at 1343 n. 9 (citing *In re Anderson,* 833 F.2d 834, 836 (9th Cir.1987)); *see also Vanston Bondholders Protect. Comm. v. Green,* 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946) ("[T]he touchstone of each ... decision on allowance of interest in bankruptcy ... has been a balance of equities between creditor and creditor or between creditor and the debtor"); *American Surety Co. v. Sampsell,* 327 U.S. 269, 272, 66 S.Ct. 571, 573, 90 L.Ed. 663 (1946) (contractual and statutory rights under state law are not applied literally in bankruptcy proceedings if result is inequitable); *In re DWS Investments, Inc.,* 121 B.R. 845, 849 (Bankr.C.D.Ca.1990) ("*Vanston* ... left to the bankruptcy court the broad discretion to balance the equities between the creditors and the debtor").

Relying on *Entz–White,* the *Beverly Drive* court concluded that the appropriate rate should be the higher of the pre-default rate or the market rate. The court reasoned that this result satisfied equity because it "balanc[ed] the preservation of contract rights with the need to compensate for actual damages incurred...." *Beverly Drive,* 117 B.R. at 567. Thus *Beverly Drive* ruled that cure intercepted automatic application of the default rate with the corollary that if equitable considerations so warranted, compensation for actual loss beyond the contract rate could be awarded.

The equitable factors underlying an award of interest alluded to in *Beverly Drive* were more thoroughly discussed in the recent case of *In re Johnson,* 184 B.R. at 570. The factors include:

(1) the difference between the default and nondefault rates; (2) the reasonableness of the differential between the rates; (3) the relative distribution rights of other creditors and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; and (4) the purpose of the higher interest rate. Specifically, does the default rate merely compensate the creditor for any loss resulting from the nonpayment of the principal at maturity, or is it a disguised penalty?

*In re Johnson,* 184 B.R. at 573.

The applicability of the default rate was also discussed in *In re DWS Investments, Inc.,* 121 B.R. 845. As the bankruptcy court explained, default interest has a limited purpose:

Claimants seek post-petition interest at the default rate of 25%. They claim this is the rate they use in other transactions. They, however, offer no evidence to show that this is an industry standard. Furthermore, they did not show that this rate has any relation to the market rate of interest. A default rate of interest should not be a penalty. Rather, it should be a means for compensating the creditor for any loss resulting from the nonpayment of principal at maturity. Claimants have not shown that the 25% rate has any relationship to actual or projected loss as a result of non-payment. *Ron Pair* supports the view that unless the statute expresses a contrary view, pre-Code law should apply.

Section 506(b) does not specify the contract rate in calculating interest on oversecured claims. On the other hand, pre-Code law does empower the bankruptcy judge to balance the equities in determining the appropriate interest rate.

*Id.* at 849.

Here, the debtor has paid the oversecured creditor its entire principal, together with a variable rate of pre-default interest (including adequate protection payments during the pendency of the sales), costs and attorneys' fees. As indicated above, a variable rate has some relationship to market rate. If the default rate is not to be a penalty, but a means by which to compensate the Bank for its actual losses, the Bank should provide specifics as to such loss.

■ The court below found the default rate of interest, an additional 7 percent, to be reasonable. This finding was based on the testimony relating to reasonableness provided by the Bank's expert, who testified:

Q: So that element of risk, though, didn't play a large role in your consideration of this loan and this default rate?

A: Correct.

Q: Did I understand you correctly to testify that the default rate in this case reflects the bank's costs?

A: Correct.

Q: In what way?

A: The bank has a lot of costs. It has very direct costs. When the loan defaults, it loses its interest income. Its expenses increase. It becomes a problem loan, a non-accrual loan. It must be monitored more frequently. There—the collection costs rise dramatically. There's the administrative costs associated with that: mail, telephones, meetings, officer time, report preparations.

There are indirect costs. The indirect costs are as some function—some amount of money has to be provided for in loan loss reserve. So there's bad debt expense of some amount.

There are also costs of increased capitalization for the bank, meaning it's a problem asset. They must have a higher capital cushion to account for problem assets in total.

Q: But it is your testimony that the seven percent default rate of interest in this case accurately reflects that incremental cost to the bank caused by the default on this particular loan.

A: It's as close as I know how to get.

Q: Is there any other factor that forms the bank's motivation for imposing default rates of interest on loans like this?

A: Yes. They want to encourage the borrower to resolve the issue. They want to eliminate a defaulted assets [sic] from their books as rapidly as possible.

Q: So it's fair to say, isn't it, that perhaps there are two components of a default rate of interest. One is to recoup costs caused by the default. Another is to coerce the debtor into making payments.

A: "Coerce" is a strong word, but they certainly want to encourage the debtor to resolve the issue, make payments, repay the loan, yes.

Cross-examination of Mr. Parker, lender's witness, Transcript of Hearing, April 24, 1995, at 25:14–27:4.

Thus, the Bank's expert, while asserting that the Bank has suffered damages, failed to quantify them or to demonstrate the extent to which they remain uncompensated. Further, the Bank's expert states that, independent of loss, coerced compliance is a factor. Implicit in this consideration is the notion of penalty. Assuming losses were sustained, the Bank provides no evidence as to the compensatory effect of a rate above the contract rate to make it whole. The Bank argues instead that, since the trial court found the default rate reasonable, the debtor has no choice but to pay it. In any event, it is not possible to perceive from the testimony of the Bank's expert, without quantification, that the figure of $260,000 represents a conscionable or reasonable charge simply for delay in payment where it had already received full payment of interest at the contract variable rate.

In the context of this case, consideration of whether a given default rate is within the range of a generally acceptable level of inter-

est is not determinative. What may be a reasonable rate of default interest at the time of trial has no necessary relationship to loss which is equivalent to damage. This requires evidence or proof of a tangible nature. Formulaic or hypothetical statements do not provide such proof. While an oversecured creditor's damages should be properly compensated, cure plus actual loss, if any, provides such compensation. Anything beyond this would constitute a penalty on the debtor. Equitable considerations do not countenance such a result.

*Future changes to the law*

In its ruling below, the trial court relied, in part, upon recent changes made to the Code pursuant to the Bankruptcy Reform Act of 1994 (the "Act"). The court noted that § 305(a) of the Act provides that the contract and nonbankruptcy law dictate the amount necessary to effect a cure under a plan. Although the legislative history makes clear that the amendment was designed to restrict rather than expand creditors' rights, the trial court reasoned that the new language served to overrule *Entz–White*.

Whether the changes restricted or enlarged the rights of secured creditors, however, they are inapplicable here because they were enacted after the case was filed and should not be applied retroactively.[9] The language of the amendment and the accompanying legislative history raise substantial questions of interpretation, but it would be gratuitous to embark on a discussion of the statute in the context of this case.[10]

We note further that while the sales at issue were not made in consummation of a plan, they took place in the context of a Chapter 11 case. The record shows, however, that the debtor filed a plan at the time of the hearing below. The plan provides for the sale of the two remaining lots and partial payment of a claim filed by the debtor's equity partner. The Bank urges us to disregard this plan because it provides for payment to an equity partner. While no confirmation issue is before us, because it may have some bearing on the equitable aspects of this matter, we note that a plan may provide for equity holders as well as creditors. Thus, a plan can appropriately provide for payment to equity holders *per se* as long as the debtor adheres to the absolute priority rule. 11 U.S.C. § 1129(b)(2)(B); *In re Johnston*, 21 F.3d 323, 328–330 (9th Cir.1994). Further, as previously indicated, the present equity holder became such in an attempt to salvage its essential position as a creditor.

The amount owing for default interest could be modified and "crammed down" under a plan as allowed under §§ 1124 and 1129. *See, e.g., In re L & J Anaheim Associates*, 995 F.2d 940, 942–943 (9th Cir.1993) (secured creditor's rights under state law can be altered under a plan where an impaired class votes in favor of the plan).[11] But for all practical purposes, the debtor has basically fulfilled the requirements of a liquidating plan. Having paid the oversecured creditor in full, and there being more than enough to

**9.** "This provision will be applicable prospectively only, i.e., it will be applicable to all future contracts...." H.R. 103–834, 103d Cong., 2d Sess. § 39, 140 Cong.Rec. 10770 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3364.

**10.** The amended version of § 1123 provides: "Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law." 11 U.S.C. § 1123(d). As the legislative history explains, the amendment "will limit the secured creditor to the benefit of the initial bargain with no court contrived windfall. It is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never oc-

curred." H.R. 103–834, 103d Cong., 2d Sess. § 39, 140 Cong.Rec. 10770 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3364.

**11.** Section 1124 provides in relevant part:

[A] class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124.

Section 1129 requires in relevant part that:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan....

11 U.S.C. § 1129(a)(10).

satisfy unsecured creditors, the formality of a plan would simply declare the rights of the parties, based on the consequences of the actions taken by the debtor and the benefits received by the creditor.

## CONCLUSION

As a general rule, the contract rate will apply unless equitable considerations dictate otherwise, *see, e.g., Terry Ltd. Partnership,* 27 F.3d at 243, although most courts take a "hard look" at default interest. *See In re Kalian,* 178 B.R. 308, 314 (Bankr.D.R.I. 1995). Ultimately, the bankruptcy court must decide whether the default rate compensates the creditor for its losses or is more in the nature of a "disguised penalty." *In re Johnson,* 184 B.R. at 573.

Here, the court considered whether the default interest rate was "unconscionable." To that end, it heard testimony from the Bank's expert regarding whether the rate was reasonable and within industry norms. The standard applied by the bankruptcy court did not give sufficient weight to the various equitable considerations. It also failed to consider the Bank's potential and actual damages, losses, and risk incurred as a result of the default.

The record here does not support a finding that the default rate was intended to or in fact did compensate the Bank for its losses. Thus, based on this limited record, the default interest awarded to the Bank appears to be a penalty or an unreasonable charge. Accordingly, the decision awarding default interest shall be reversed and remanded to the bankruptcy court for further consideration of the purpose of the Bank's default interest rate and whether it actually compensated the Bank for losses incurred as a result of the debtor's default.

REVERSED and REMANDED.

McKEAG, Bankruptcy Judge, concurring:

I generally concur in the judgment of the Panel and specifically endorse its analysis of the equitable factors that govern an award of default interest. I write separately, however, to address the broader implications of the Panel's discussion of "cure." First, I disagree with the majority's conclusion that the concept of "cure" should apply to a lien-free sale. Additionally, the authorities relied upon by the majority in reaching that conclusion would prohibit any award of default interest in a sale setting.

Sections 1123(a)(5) and 1124(2) of the Bankruptcy Code expressly recognize the right to "cure" a default through a Chapter 11 plan of reorganization. The two leading cases decided by the Ninth Circuit Court of Appeals which discuss "cure" are both firmly rooted in the plan confirmation process. *See In re Entz–White Lumber & Supply, Inc.,* 850 F.2d 1338, 1340 (9th Cir.1988); *In re Southeast Co.,* 868 F.2d 335 (9th Cir.1989). Specifically, in each, the circuit court's primary focus was whether the secured claim was "unimpaired" under section 1124(2) for plan confirmation purposes. To answer this question, the court had to consider whether the creditor should receive the post-default interest rate in order to be returned to its pre-default status. Both cases held in the negative.

Courts in other circuits have not extended the discussion of "cure" in *Entz–White* and *Southeast* to the lien-free sale setting. Rather, these courts simply determined the amount of the creditor's allowable claim under section 506(b), including equitable entitlement to default interest, in order to distribute the proceeds from the sale of the creditor's collateral. The issue of "cure" never even surfaces in these decisions. *See, e.g., In re Terry Limited Partnership,* 27 F.3d 241 (7th Cir.), *cert. denied sub nom.,* —— U.S. ——, 115 S.Ct. 360, 130 L.Ed.2d 313 (1994); *In re Kalian,* 178 B.R. 308 (Bankr.D.R.I.1995); *In re Consolidated Properties Ltd. Partnership,* 152 B.R. 452 (Bankr.D.Md.1993); *In re Hollstrom,* 133 B.R. 535 (Bankr.D.Colo.1991).

In the Ninth Circuit, the few reported decisions that have considered whether a default can be "cured" in connection with a lien-free sale reach different results. Courts have expressly stated that *Entz–White* and *Southeast* are inapplicable to sales pursuant to section 363. *In re Boardwalk Partners,* 171 B.R. 87, 90, n. 1 (Bankr.D.Ariz.1994); *In re Melbell Associates, Inc.,* 99 B.R. 31, 34

(Bankr.E.D.Cal.1989). While these decisions did not consider the issue at any length, they refused to extend the concept of "cure," as interpreted for purposes of sections 1123 and 1124, to a lien-free sale under section 363.

On the other hand, *In re 433 South Beverly Drive*, 117 B.R. 563 (Bankr.C.D.Cal.1990), relied upon by the majority, reached the opposite conclusion. Applying the rationale of *Entz–White* and *Southeast* to a lien-free sale, the court held that the request for post-default interest should not be treated any differently in a sale than under a Chapter 11 plan. Accordingly, consistent with *Entz–White* and *Southeast*, it disallowed default interest. The court reasoned that the concept of "cure" is not exclusive to Chapter 11 and should be consistent throughout the Bankruptcy Code. As authority for this proposition, the court referenced section 365 of the Bankruptcy Code dealing with executory contracts and unexpired leases, which, like sections 1123 and 1124, but unlike section 363, specifically uses the term "cure." The decision merely concluded that the absence of the term "cure" from section 363 is not critical.

These conflicting authorities do not satisfactorily resolve the issue of whether the *Southeast* and *Entz–White* holdings should apply to lien-free sales. However, on balance, I believe the concept of "cure" should not be applied in a section 363 lien-free sale context. First, the plain meaning of the statute should control. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242–243, 109 S.Ct. 1026, 1030–32, 103 L.Ed.2d 290 (1989). While Congress used the term "cure" throughout the Bankruptcy Code, it did not use it in connection with section 363 sales. This fact alone is sufficient reason not to expand the holdings in *Southeast* and *Entz–White* to lien-free sales.

Another reason favoring a more conservative approach is that the consequences of a "cure" through a confirmed plan, as opposed to a lien-free sale, may differ. Although payment in full of a secured claim can occur in either setting, the distinction can be important and was implicitly recognized in

*Entz–White.* The creditor in *Entz–White* claimed that the proposed Chapter 11 plan could not "cure" the default because its loan had fully matured prior to bankruptcy. It relied on *In re Seidel,* 752 F.2d 1382 (9th Cir.1985), a Chapter 13 case, which stated:

> But when a debt has already matured—as in Seidel's case—'cure' as defined by these courts cannot aid the debtor, since reinstatement of the original terms of the debt will merely make the debt immediately due and payable.

752 F.2d at 1386. *Entz–White* recognized *Seidel* as good law. The court pointed out that because the proposed plan made the creditor's obligation "immediately due and payable" upon confirmation, it did precisely what *Seidel* required.[12]

The facts in this appeal illustrate the potential problems with treating payment through a sale of the creditor's collateral as the equivalent of a "cure" under a plan. Here, as in *Entz–White*, the loan matured by its terms prior to the Debtor's bankruptcy. Although the Bank obtained relief from the automatic stay early in the Chapter 11 case, the effective date of the relief was delayed approximately ninety days to permit the Debtor to complete a pending bulk sale of the project. When this sale fell through, the Debtor obtained permission from the California Department of Real Estate to sell the property in individual lots. It also obtained a series of preliminary injunctions from the bankruptcy court, contingent on payment of current interest to the Bank, delaying the Bank's foreclosure until the individual parcels of property could be sold.

This chronology of events must be contrasted to an immediate and complete repayment of the Bank's entire claim upon plan confirmation. In fact, these piecemeal sales of the Bank's collateral and reduction of its indebtedness over time would not have constituted a "cure" for purposes of *Entz–White.* The Ninth Circuit Court of Appeals was explicit that a naturally matured loan would need to be paid immediately upon confirmation to obtain the benefits of a "cure." Thus,

---

**12.** At least one court has allowed default interest because the plan failed to pay off a matured loan

on confirmation. *In re Tri–Growth Centre City, Ltd.,* 136 B.R. 848, 852 (Bankr.S.D.Cal.1992).

in this case, the Debtor did not and could not have confirmed a plan which, consistent with the requirements of *Entz–White,* left the Bank unimpaired and "cured" its obligation.[13] These circumstances ably demonstrate why the benefit of annulling default interest should not automatically be extended to every sale in which a secured creditor is paid off.

The majority equates the pay-off of a loan as part of a section 363 sale to a "cure" pursuant to a confirmed plan. The consequence of this approach, however, is that the Bank would not be entitled to default interest. While *Entz–White* recognized the bankruptcy court's discretion to determine an appropriate interest rate, it concluded that:

> [The debtor] is entitled to avoid all consequences of the default—including higher post-default interest rates.... It is clear that the power to cure under the Bankruptcy Code authorizes a plan to nullify all consequences of default, including avoidance of default penalties such as higher interest.

850 F.2d at 1342. This principle was reaffirmed in *Southeast.* 868 F.2d at 338. Consistent with these decisions, the bankruptcy court in *Beverly Drive* limited the interest rate to the higher of the market rate or the predefault rate, but did not allow default interest. 117 B.R. at 567.

The decision regarding whether the concept of "cure" applies to a lien-free sale is directly tied to the question of whether the Bank is even entitled to receive default interest. Implicit in that concept, as interpreted by the Ninth Circuit Court of Appeals in *Entz–White,* is a prohibition against default interest. On the other hand, if the more limited approach I urge is followed, the Bank **may** still be able to collect default interest under section 506(b). On remand, the bankruptcy court should consider the fact that the Bank has now been fully repaid, thus receiving the equivalent of a "cure" of its defaulted loan obligation. That factor alone, however,

should not preclude the allowance of default interest.

I agree with the result reached by the majority, which requires the bankruptcy court to examine and consider various equitable factors before allowing default interest. My disagreement extends only to the Court's application of the *Entz–White* and *Southeast* holdings to lien-free sales, which would preclude any award of default interest.

---

**13.** The Debtor has now proposed a plan that provides for full payment of the Bank's claim. The bankruptcy court correctly determined, however, that filing a plan after the sales had been completed and the Bank was already paid did not warrant treatment under *Entz–White.* To the extent the Bank's default had been cured, it was cured outside of a plan. Transcript of Hearing, February 21, 1995, pp. 10–12.